**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| MAFCOTE, INC. } | |
| } | |
| Plaintiff } | **Cause No.** 3:23CV-266-GNS |
| v. } | |
| } | **COMPLAINT** |
| UNION OFFICINE MECCANICHE, S.P.A. } | |
| VIA 1 Maggio 12/14 } | |
| S. Vittore Olona (Mi) Italy 20028 } | |
| } | |
| } | |
| Defendant } | |

Plaintiff Mafcote, Inc, complaining of Defendant Union Officine Mecaniche, S.P.A. alleges and says:

### Jurisdiction and Venue

1.      Plaintiff Mafcote, Inc. ("Mafcote") is a Delaware corporation organized and existing under the laws of the State of Delaware with its principal place of business in at 108 Main Street, Norwalk, CT  06851.  Mafcote owns the facilities at 1450 South 10th Street, Louisville, Kentucky.

2.      Defendant Union Officine Meccanice ("Union") is a foreign limited liability company organized and existing under the laws of Italy, within its principal place of business in Milan, Italy.  Upon information and belief, the Plaintiff states that Union does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

3.      Diversity of citizenship exists because Mafcote is a Delaware Corporation and Union is a foreign limited liability company.  The amount in controversy is over $75,000.00

4.      Union is subject to the jurisdiction of this Court pursuant to KRS 454.210 because it transacted business in the Commonwealth of Kentucky, and it contracted to supply goods and services in this Commonwealth.

5.      Venue is proper in the Western District of Kentucky because it is the judicial district in which a substantial action, as required in a Contract were to take place.  For example, the machine sold pursuant to this agreement is to be shipped to Louisville, Kentucky.  They committed to complete install and commission in Louisville, Kentucky.  The installation and commission of the machine sold was to occur in Louisville, Kentucky.  The use of the machine in the manufacturing process was to occur in Louisville, Kentucky.  There is no intention to use the machine in any state other than Louisville, Kentucky.

6.      The court has personal jurisdiction over the Defendant because the Defendant conducted business and entered into contracts as set forth in paragraph 5 above.  These actions are sufficient for the Court to have personal jurisdiction over the Defendant.   The Defendant has sufficient minimum contacts with Kentucky. The equipment was delivered to the plant facility in Louisville, Kentucky and was to be operational there.

### Statement of Facts in Support of Claims

7.      Mafcote is in the business of producing various products, some of which incorporate foam in the product.

8.      Mafcote sought to purchase a machine which would produce foam that would be used in foamboard, a product made and sold by royal Consumer Products, a wholly owned affiliate of Mafcote, Inc.

9.      Use of the machine in manufacturing certain products was to take place at a plant located at 1450 S. 10th Street, Louisville, Kentucky 40210 and the machine was to be delivered there.

10.     Through a machinery broker, employed by Union, Mafcote received a Quotation N. 21/1047_Rev.2 dated April 13,2021.  The quotation was to the attention of Steven Schulman, its President.

11.     A copy of the Quotation, which describes in detail the machine to be purchased and all attachments, is attached hereto, made a part hereof, and is marked Exhibit A.

12.     The Quotation reflects that Union had knowledge of the purpose for which the machine was to be used -  " for the production of  XPS  sheet, width  1250  mm, thickness 2-5mm,  output 200kg/h".

13.     Thereafter, Mafcote received an Order Confirmation which was dated April 6, 2021. The description of Scope of Supply was " complete  second -hand extrusion line  XPSF-200 for the production of  XPS sheet, width 1250mm, thickness 2-5mm, output 200kg/h. Line height 4400 mm. A copy of this Order Confirmation is attached hereto, made a part hereof, and marked Exhibit B.

14.     Mafcote did not agree with the terms of sale proposed by Union.

15.     Mafcote counter-offered with a purchase order dated June 24, 2021 and numbered PO# 13311B.   A copy of the entire purchase order with attachments is attached hereto, made a part hereof, and marked Exhibit C.

16.     The Purchase Order states in part that the Order Confirmation (Exhibit B herein) supersedes the Quotation (Exhibit A herein).

17.    In addition, the Purchase Order # 1311B incorporated, along with the Quotation and the Order Confirmation, an Attachment C which set forth certain requirements as to the production capabilities required of the machine to be purchased. (See Purchase Order Attachment C).

18.    Purchase Order #1311B set forth additional terms in Part I thereof. These terms included, but were not limited to delivery to, Louisville, Ky, of the machine to be purchased and incorporated the installation and commission of the machine, including electrical at the site.

19.    Time was stated as "of the essence" in the Purchase Order.

20.    The Purchase Order provided at paragraph 3 the following specifications and warranty requirements:

> Product Specification and Production Speeds and Further Warrantee. It is represented, warranted and guarantees that the Machine can produce the Product in widths and in the specifications and at the production output as specified per Attachment C. Warrantee on mechanical parts is 6 months. Machine fit for purpose. Samples of our foam which comes in white and black ("Product") are being sent with the original of this Purchase Order.

21.    Mafcote has complied with the payment terms set forth in the Purchase Order 1311B except for the remaining 25% of the contract price because the machine has not been installed and commissioned as agreed.

22.    The machine does not perform in a manner compliant with the specifications and warranties of the Purchase order #1311B.

23.    Part II of the Purchase Order #1311B included additional provisions for the purchase of Mandrels.

24.    An Order Confirmation N. 21/1137 confirms the purchase of the Mandrels and is also a part of Attachment B to Purchase order #1311B. This Order Confirmation is attached hereto,

made a part hereof, and marked Exhibit D.  (This document is also a part of Attachment B to PO #1311B)

25.    Thereafter, Mafcote and Union entered into further negotiations which resulted in Purchase Order #1324B which is dated July 18,2021, a copy of which is attached hereto, made a part hereof, and marked Exhibit E .

26.    According to Purchase Order #1324B, the parties reached an agreement as to payment of custom duties.

27.    Through this subsequent Purchase Order #1324B, PO #1311B was reinstated "with all it terms as is".  In particular, a representation of express warranty was acknowledged.

28.    As further evidence that the Purchase Orders are controlling, Steven Schulman sent an email dated July 19, 2021 to Ferdinando Passoni of Union urging confirmation that Union completely agreed with the Purchase Orders.  A copy is attached hereto and made a part hereof marked as Exhibit F.

29.    This email incorporated through Purchase Order 1324B, all of the terms of both Purchase Orders. These documents and attachments thereto reflect the consent of Union to the terms of the Purchase Orders.

30.    The machine was shipped to Louisville, Kentucky as agreed but no supervisors ever arrived to fulfill the requirements of the contract.

31.    The machine has not been properly installed or commissioned by Union as agreed. Moreover, no training by Union was ever conducted.

32.    The shipment of the machine and acceptance of partial payment is further evidence that Union is bound by the terms of these Purchase Orders.

33.     The machine  does not now and never has produced the Product in widths and in the specifications and at the production output specified in Attachment C to  PO #1311B  upon which Mafcote relied.

34.     The machine is not of any use to Mafcote in its current state.

35.     At the time of sale, Union assured Mafcote that the machine would be fit for use in Mafcote's manufacture of a particular foam.

36.     Union was fully aware that the manufacture of a particular foam was the reason for the purchase and was well aware of Mafcote's intended purpose for the machine.   Mafcote even sent foam samples to Union so that its needs were made perfectly clear.

37.     Mafcote relied on Union's representations that the machine was fit for Mafcote's intended purpose.

38.     Mafcote would not have purchased the machine without these representations of Union upon which Mafcote relied.

39.     The machine does not produce an acceptable foam as per the agreement requirements.

40.     Additional problems with the machine include, but are not limited to, Extruder Issues and damaged/non-function parts:

- Gas injection port
- injection rod bent, air cylinder leading-needs rebuilt
- Gas injection Port pressure sensor was damaged and needs replaced
- Dynisco 1401 controllers: 12 are bad and need replacement- currently working on replacement parts as this items is obsolete
- Maguire starve feeder had a bad board and needed to be sent out to Maguire for repair
- LEWA pump has a faulty pressure relief valve that needs to be replaced
- LEWA pump also had to be rebuilt as the diaphragms (3) were all bad
- Pressure transducer had to be replaced
- Gas flow meter on control panel is bad and needs replaced

6

41.     In addition to the issues listed in Paragraph 40, the machine had a bolt where the barrel pressure relief valve should have been located.

42.     A bearing was cracked on one of the rewinds.  When an attempt was made to commission the machine, the 6 foot "heat exchanger section" machine failed.

43.     When an attempt was made to commission the machine, it was found that the 6 foot "heat exchanger section' of the Machine was unable to operate.  Upon inspection, it was determined that polystyrene had contaminated part of the heat exchanger's oil lines, gaskets had been miss-aligned, and stress cracks were evident.  It was determined that the heat exchanger was beyond repair and a new heat exchanger has been ordered.  The approximate cost of the new heat exchange is $130,000.00.

44.     This section consists of two enclosed basket-like parts ("baskets") to coll the polystyrene.  The first basket defectively allowed polystyrene to contaminate its internal oil lines.  This contamination reached back to the oil pump.  Upon examination of the heat exchanged, the O ring was miss-placed, and the first basket waws filled with polystyrene in its internal oil lines.  The second basket contained numerous surface stress cracks.  Both baskets are aluminum which is too weak a material for the purpose intended. The surface stress cracks suggest the heat exchanger is near the end of its working life span.

45.     Union has refused to make any necessary repairs or corrections and instead simply demands the remaining payment under the Agreement.

46.     Mafcote has regularly and repeatedly made Union aware of the problems Mafcote is experiencing with the machine and complained of the lack of proper installation and commissioning.

47.     Mafcote has suffered damages as a result of Union's failure to comply with the agreement.

## FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

48.     Mafcote repeats and realleges the allegations of the preceding and following paragraphs as though set forth fully herein.

49.     Mafcote and Union entered into a binding contract, whereby Union agreed to sell and Mafcote agreed to purchase a machine fit for Mafcote's use in manufacturing the foam as described in the Quotation and Order Confirmation.

50.     Union has breached the contract by failing to provide a machine that can manufacture the foam

51.     As a direct and proximate cause of Union's breach of contract, Mafcote has incurred damages in excess of $75,000.00 as further evidenced in the counts below.

## SECOND CLAIM FOR RELIEF: BREACH OF EXPRESS WARRANTY

52.     Mafcote repeats and realleges the allegations of the preceding and following paragraphs as though set forth fully herein.

53.     Union provided Mafcote with an express warranty for the 5-Axis machine.

54.     Union has breached the warranty by providing a machine that will not perform as warranted to manufacture the specialized adaptor plates.

55.     As a direct and proximate cause of Union's breach of warranty, Mafcote has incurred damages in excess of $75,000.00.

56.     Mafcote is entitled to damages pursuant to KRS 355.2-313 and 355.2-714, for actual expenses incurred to date due to the necessity of consulting services and expenses related thereto in an attempt to get the machine operational in the amount of $301,382.00, maintenance

expenses incurred in the amount of $22,975.00 and machine repair expense of $25,000.00. In addition, other damages which can not be enumerated at this time including but are not limited to loss profits, loss of business opportunity, and other expenses and damages likely to be incurred in the future.

## THIRD CLAIM FOR RELIEF: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

57.    Mafcote repeats and realleges the allegations of the preceding and following paragraphs as though set forth fully herein.

58.    At the time of the sale and before delivery and installation, Union assured Mafcote that the 5-Axis machine was merchantable.

59.    At the time of the sale and before delivery, Union knew that Mafcote intended to use the 5-Axis machine in the manufacture of the specialized adaptor plates.

60.    At the time of the sale and before delivery, Union assured Mafcote that the machine would be fit for use in the manufacture of the specialized adaptor plates and would conform to the ordinary purposes for which such 5-Axis machines are used.

61.    Union did not disclaim the implied warranty of merchantability.

62.    Union has breached the implied warranty of merchantability.

63.    As a direct and proximate cause of Union's breach of implied warranty, Mafcote has incurred damages in excess of $75,000.00.

64.    Mafcote is entitled to damages pursuant to KRS 355.2-314 and 355.2-714 for actual expenses incurred to date due to the necessity of consulting services and expenses related thereto in an attempt to get the machine operational in the amount of $301,382.00, maintenance expenses incurred in the amount of $22,975.00 and machine repair expense of $25,000.00. In addition, other damages which can not be enumerated at this time including but are not limited to

loss profits, loss of business opportunity, and other expenses and damages likely to be incurred in the future.

### FOURTH CLAIM FOR RELIEF: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

65.    Mafcote repeats and realleges the allegations of the preceding and following paragraphs as though set forth fully herein.

66.    At the time of the sale and before delivery and installation, Union knew that Mafcote intended to use the 5-Axis machine in the manufacture of specialized adaptor plates.

67.    At the time of sale and before delivery and installation, Union assured Mafcote that the 5-Axis machine would be fit for use in manufacturing foam as the purchase order specified and would conform to the ordinary purposes for which such machines are used.

68.    Mafcote relied on Union to select and furnish a machine that would be fit for use in the manufacture of foam as specified and would conform to the ordinary purposes for which such machines are used.

69.    Union did not disclaim the implied warranty of fitness for a particular purpose.

70.    Union has breached the implied warranty of fitness for a particular purpose.

71.    As a direct and proximate cause of Union's breach of implied warranty, Mafcote has incurred damages in excess of $75,000.00.

72.    Mafcote is entitled to damages pursuant to KRS §355.2-315 and KRS §355.2-714 for actual expenses incurred to date due to the necessity of consulting services and expenses related thereto in an attempt to get the machine operational in the amount of $301,382.00, maintenance expenses incurred in the amount of $22,975.00 and machine repair expense of $25,000.00.  In addition, other damages which can not be enumerated at this time including but are not limited to loss profits, loss of business opportunity, and other expenses and damages likely to be incurred in the future.

**WHEREFORE**, Plaintiff, prays for relief as follows:

1.      That Mafcote be awarded damages for breach of contract and for breach of warranties as set forth herein which are in excess of $75,000.00.

2.      That Mafcote be awarded all actual, direct, consequential, and other available damages against Defendant Northwood in an amount to be proven at trial.

3.      That Mafcote recover its costs, including all reasonable attorneys' fees, as provided by law.

4.      That Mafcote have such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/K. Gail Russell
K. Gail Russell
Charles W. Dobbins, Jr.
Tilford, Dobbins & Schmidt, PLLC
401 West Main Street, Suite 1400
Louisville, Kentucky 40202
Phone: (502) 584-1000
*Counsel for Plaintiff*

ATTACHMENT A

PLASTIC TECHNOLOGY SINCE 1950



# QUOTATION

## N. 21/1047_REV.2



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES



EXHIBIT

www.unionextrusion.i



EXTRUSION LINES FOR FOAM PRODUCTS





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

San Vittore Olona, 13.04.2021

Our Reference: Sales Dept. FP/ns
Code: ST-CA

**Quotation n. 21/1047_Rev.2**

Messers

**Mafcote Inc.**
108 Main Street
Norwalk, CT 06851

Attention to: Mr. Steven Schulman

## SCOPE OF SUPPLY:

Complete second-hand extrusion line type XPSF-200 for the production of XPS sheet, width 1250 mm, thickness 2 - 5 mm, output 200 kg/h.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

**UNION** officina meccanica S.p.A. Socio Unico
Via 1° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331.519300 - Fax +39 0331.518370 - E-mail: info@unionextrusion.it
C.F. e P.IVA 07641110155 - V.A.T. n.IT07641110155 - Mecc. MI029104
Reg. Imprese n. 238499 - REA MI-1171813 - Cap. Soc. € 2,500,000,00 i.v.

  

w w w . u n i o n e x t r u s i o n . i t

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# GENERAL TECHNICAL DATA

| | | |
|---|---|---|
| ELECTRICAL | Power supply | 3-phases x 400 V + G |
| | Frequency | 50 Hz |
| | Max. power surge | ± 10% |
| | Protection | IP54 |
| | | Atex zone D class 2B for blowing agent dosing device only |
| WATER | Temperature | 8°C |
| | Pressure | max. 4 bar |
| | Hardness | max. 8 - 10° dH |
| | Carbonic acid | max. 50 mg/l |
| | Index of pH | 7.7 - 7.8 |
| COMPRESSED AIR | Line pressure | 6/8 bar |
| | Quality | Filtered and dry |
| EQUIPMENT DESIGN | Piping | ASTM – ANSI |
| | Instrumentation | ISA |
| | Electrical | IEC - EN - 2014/35/UE - 2014/30/UE |
| ENVIRONMENTAL CONDITIONS | Site location | USA |
| | The line is designed for | indoor installation |
| | Minimum indoor temperature | + 5°C |
| | Maximum indoor temperature | + 40°C |
| | Altitude | ≤ 1000 m see level |
| PAINTING | Machine | RAL 7032 (grey) |
| | Protections | RAL 2000 (orange-yellow) |
| | Switch cabinets | RAL 7032 (grey) |
| DOCUMENTATION | Manuals | Italian, English |
| | Labels on the line | English |
| | Operator panel | English |

NOTE 1:  All the technical data of the present document are to be considered only indicative and subject to possible revision during the development of the project.

NOTE 2:  The "connecting points" needed to connect all the equipment of the line to the utilities (electrical, chilled water, industrial water, compressed-air, gas) must be available at the site of installation and provided by the buyer.

The "connecting points" are more than one along the line.

The correct positioning of each "connecting point" will be made known to the buyer upon delivery of the final drawings of the line which must be signed for acceptance before starting the manufacturing of the line.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## MAIN DATA

| | |
|---|---|
| Throughput | up to 200 kg/h, depends on sheet thickness and type of the blowing agent used |
| Sheet foam density | min. 40 - 70 kg/cm³, depends on type of the blowing agent used |
| Sheet thickness | 2 - 5 mm (mechanical limits) |
| Coil diameter | max. 2000 mm |
| Sheet width | 1250 mm (to be defined during the order) |
| Mechanical speed | 25 m/min |
| Production speed | 15 m/min |
| Height of screw centreline | 1050 mm |







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## LINE COMPONENTS AND PRICE

ITEM 1    N. 1    FEEDING AND GRAVIMETRIC DOSING DEVICE

ITEM 2    N. 1    CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

ITEM 3    N. 1    BLOWING AGENT DOSING DEVICE

ITEM 4    N. 1    STATIC MIXER

ITEM 5    N. 1    EXTRUSION DIE

ITEM 6    N. 1    COOLING RING

ITEM 7    N. 1    COOLING CALIBRATOR APPROX. 398 MM

ITEM 8    N. 1    "S" TAKE-OFF UNIT

ITEM 9    N. 1    TWIN CANTILVER WINDER

ITEM 10   N. 1    ELECTRICAL EQUIPMENT

ITEM 11   N. 1    INSTALLATION AND START-UP
                  (3 weeks of 5 working days included;
                  local transport, board & lodge costs excluded)

**TOTAL PRICE FOB GENOVA**                    €uro   336.200=







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# DESCRIPTION

ITEM 1    N. 1    FEEDING AND GRAVIMETRIC DOSING DEVICE

Suction conveying device for 5 components.
Gravimetric dosing device for 5 components.

| | |
|---|---|
| Throughput | max. 300 kg/h |
| Dosing accuracy | ± 0.5% |
| Motor | a.c. with inverter |

The different components can be dosed in the following ranges:

| | | |
|---|---|---|
| Component A | PS virgin | 5 - 50% |
| Component B | PS recycled | 10 - 100% |
| Component C | Nucleating agent | max. 2% |
| Component D | Talcum | max. 2% |
| Component E | Colour masterbatch | max. 2% |

All components in form of granulates are fed to a gravimetric dosing device.

The dosing device is operated from the main panel of the line.

The dosing device allows to store up to 200 recipes.

ITEM 2    N. 1    CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

| | |
|---|---|
| Screw diameter | 127 mm |
| L/D ratio | 32 |
| Screw speed | max. 50 rpm |
| Driving power | a.c. motor of 95 kW |

**Barrel**
Two barrels in nitrided steel (material LK3) with a surface hardness of more than 115 HRC. The first barrel provided with one bore for the injection of the blowing agent arranged on a barrel length of 10 D. The first barrel includes also the feeding section.

**Screws**
Each screw in one piece with a central bore for cooling in front of the second barrel of the extruder. The profile of the screws is designed corresponding to the process and material data. Screw material is nitrided steel (material LK3) with a surface hardness of more than 110 HRC.

**Heating/cooling zones**

No. 1 cooling zone for the feeding section cooled directly with the cooling water of the customer. The water flow is regulated by a temperature control.

No. 4 heating/cooling zones equipped with electrical heaters located on the first barrel.

No. 2 cooling zones with thermal oil.

External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.








SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

**Reduction gear**

| | |
|---|---|
| Service factor | AGMA min. 1.8 – 2.0 |
| Starting torque | 1.25 fold nominal torque |
| Lifetime of bearings | min. 25.000 hours |

The reduction gear is directly coupled to the driving motor by a Mayer safety coupling.

**Barrel supports**
Two supports which move along rails to compensate the longitudinal thermal extension.

**Base frame**
Sectional steel construction for gear unit, motor and barrel supports. The lower part of the frame is completely closed with inside the connection boxes for all users in Atex.

**Accessories**
Screw ejection tool manually operated.

**ITEM 3    N. 1    BLOWING AGENT DOSING DEVICE**

Consisting of one blowing agent dosing device for max. 50 l/h of hydrocarbons.

The device includes:

- no. 1 diaphragm pump with 3 membranes
- no. 1 injection valve
- no. 1 flow meter with signal transducer
- no. 1 flow regulator

The device is mounted on a steel rack to be installed outside.
The electric equipment is mounted in the switch cabinet of the extrusion line.

The rack and all the piping of the dosing devices toward the extruder are made in AISI 316 stainless steel. The supply includes the piping for a max. distance between dosing devices and extruder of 10 m.

Protection class Atex.

**ITEM 4    N. 1    STATIC MIXER**

The static mixer positioned between the extruder and the wide extrusion die is used to homogenize the temperature of the melt.

The static mixer is connected to the extruder and the die by clamps heated with electric heaters of 1.5 kW on each side. The temperature can be regulated.

| | |
|---|---|
| Diameter | 115 mm |
| Length | 6 D |

Body in hardened and tempered steel with mixing elements in stainless steel AISI 316, internal chamber for heating/cooling by thermal oil.





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES


External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.

The pressure and the temperature of the melt is measured before and after the static mixer.

The support of the static mixer is fixed to the support of the extruder.

ITEM 5     N. 1     EXTRUSION DIE

Die diameter                    115 mm
Gap opening                     manual adjusting

The temperature of the die is controlled by no. 2 heating/cooling zones.

External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.

At the end of the die a ring is applied, cooled by water, to finish the external side of the sheet.

ITEM 6     N. 1     COOLING RING

The cooling ring mounted on the carriage moving on rails is used to cool the external side of the sheet. The cooling is done by the blower with a motor of 2.5 kW. The air is blown along the whole circumference of the sheet before the longitudinal cutting.

At the end of the die the ring is applied, cooled by water, to finish the external side of the sheet.

ITEM 7     N. 1     COOLING CALIBRATOR APPROX. 398 MM

The cooling calibrator is mounted on the carriage moving on rails.

The calibrator is in one cooling zone in order to guarantee a gradual and uniform cooling.

In the front side of the calibrator the air is blown to expand the tubular sheet coming from the die.

On the carriage of the calibrator two blades are also fixed for the longitudinal cutting of the sheet.

ITEM 8     N. 1     "S" TAKE-OFF UNIT

Unit has no. 2 rubberized rolls, one above the other, around which the sheet moves according to an "S".

Diameter of rolls               400 mm
Width of rolls                  1500 mm

The rolls have a double wall for a possible cooling ring in the future.

No. 2 rolls are driven by a gear motor of 5.5 kW controlled by an inverter.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

On the first roll a pressure roller is applied, the pressure is regulated pneumatically.

At the end of the unit an idle roller is provided to guide the sheet to the winder.

ITEM 9   N. 1    TWIN CANTILVER WINDER

The winder is formed by two thick steel sheets connected together.

| | |
|---|---|
| Expansion shafts no. | 2 |
| Diameter of expansion shafts | 300 mm |
| Width of expansion shafts | max. 1300 mm |
| Width of sheet | max. 1240 mm |
| Diameter of coils | max. 2000 mm |
| Winding speed | max. 50 m/min |
| Driving motors | 4.5 kW each |

The sheet is winded manually by adhesion on the expansion shaft. Once reached the requested diameter the coil is automatically extracted from the winding station by means of a pneumatic device.

ITEM 10  N. 1    ELECTRICAL EQUIPMENT

1 a.c. main drive for the extruder
1 a.c. drive for the carriage of the cooling ring
1 a.c. drive for the carriage of the cooling calibrator
1 a.c. drive for the "S" take-off unit
2 a.c. drives each for the winder
1 gravimetric feeding and dosing device
3 pressure/temperature devices of the melt
1 blowing agent dosing device
5 electrical heating/cooling zones
6 oil heating/cooling zones
4 water cooling zone
1 oil cooling zone

Other two small local desks located one near the winder and the other near the "S" take-off unit and rewinding.

ITEM 11  N. 1    INSTALLATION AND START-UP

3 weeks of 5 working days included.
Local transport, board & lodge costs excluded.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
Ready in Union.

Terms of delivery
FCA Seller's factory in San Vittore Olona (MI) according to Incoterms® 2020 I.C.C. Paris.

Transport
Not included in the price.

Packaging
Not included in the price.

Terms of payment
- 30% down payment at the order
- 70% before delivery

Preliminary test
A test of the line will be carried out in Seller's factory.
The necessary raw materials are at Buyer charge.
The terms and conditions of the preliminary test shall be commonly agreed by the parties upon signing of the contract and indicated as separate Annex 1, in any case as integral part of the contract.

The Buyer shall have to delegate one of his technicians authorized to sign the preliminary test protocol. In case the Buyer does not request to attend the testing, he won't be in a position to contest the result of the same. The test will be considered positive if the Buyer has not requested to attend it.

The machinery, the equipment and the accessories necessary for the line operation, when bought separately by the Buyer, shall have to be delivered and installed at Seller's premises at the diverse suppliers' charge at least 15 days before the date of the provided test. It's acknowledged that in any case the Seller is not responsible of the correct functioning of these parts if they are supplied by the Buyer and not making part of the supply.

Installation
The installation of the line means the placement, assembling, alignment, fixing and connection of all the equipment and accessories at the right place on site, made by Seller's specialist with the support of Buyer's personnel and handling equipment to be provided by the Buyer (cranes, forklifts etc.).

Placement:
Means the positioning of the equipment, at the right place, on site of installation.

Assembling:
Means the re-assembling on site of all the parts that was dismounted for shipping purpose.

Alignment:
Means the position of all the equipment securing the perfect alignment among them, using the right tools and technique.

Fixing:
Means the drilling and fixing on floor of each equipment and accessory supplied by the Seller.

Connection:
Means the connection of power, water, air, gas from the "connection points" available on site to all the equipment along the line.

The Seller's specialist will arrive on site and begin the installation only when the Buyer communicate by writing to the Seller the readiness of the following works on Buyer side:

- All the "connection points" for the connection of the equipment to the utilities (electrical power, chilled water, compressed air, industrial water, gas) are ready at the agreed place/s, as foreseen in the final lay-out undersigned by the parties before starting the manufacturing phase.








SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

- The air-ducts to place the electrical cables from the main electric desks to each equipment and to the remote operating panel/s shall be ready for the assembling and it shall have the size, dimension and route, like indicated in the official lay-out undersigned by the parties before the manufacturing.

- All the equipment necessary for the installation and commissioning (not delivered by Seller but supplied by the Buyer) shall be available at site and ready for working.

- All the adequate equipment needed for the movement and lift of the machineries, like forklift and/or crane shall be available at site.

Costs:
The cost of the installation is not included in the present quotation and will be charged separately as per the following terms:

- Daily cost for one specialist each weekday (from Monday to Friday)..................................................................1000€/day
- Daily cost for one specialist each holiday (Saturday, Sunday).......................................................................1200€/day

- Travel costs (flight/rental car/taxi)................................................................................................................to be charged at cost
- Hotel accommodation & Food..........................................................................................................................to be charged at cost

Final Commissioning & Training
The Final Commissioning of the line can start when the installation is concluded, that means the line can be switch-on and is ready for the dry and wet test.

The training of Buyer's personnel will be done by Seller's specialist when the Final commissioning is completed and accepted.

The terms and conditions of the Final Commissioning shall be commonly agreed by the parties upon signing of the contract and indicated as separate Annex 2, in any case as integral part of the contract.

Dry test: Means the test without material made to verify the correct functioning of all the parts of the line and its accessories, signals and safety alarms.

Wet test: The upstream will be tested and accepted when running with the material and when the performance commonly agree by the parties upon signing the contract are satisfied.

Costs:
The cost for the commissioning and training is not included in the present quotation and will be charged separately as per the following terms:

- Daily cost for one specialist each weekday (from Monday to Friday)..................................................................1000€/day
- Daily cost for one specialist each holiday (Saturday, Sunday).......................................................................1200€/day

- Travel costs (flight/rental car/taxi)................................................................................................................to be charged at cost
- Hotel accommodation & Food..........................................................................................................................to be charged at cost

*The estimates for the installation, commissioning and training are subject to variables and contingencies at site, for this reason shall be intended just as indicative and it doesn't constitute any responsibility for the Seller.

Warranty
The Seller warrants to the Buyer that the machines manufactured under this contract are exempt from defects that make them inappropriate for using for a period of 12 months from the date of delivery.

The claims, subject to expiration, must be made known in writing to the Seller within 8 days from their detection and must indicate in details the alleged defects and no-compliances.
The warranty consists of the repair or of the substitution free of charge of the spares defective for faults of the material, of the construction or of the manufacture, only and exclusively if such parts, whenever necessary, are returned to the Seller.
The forwarding costs, the transport fees or any other expense or tax ensuing both from the return of the faulty part and from the dispatch of the new spare, will be exclusively charged to the Buyer.

The Parts agree to exclude the possibility to terminate the contract or any other reward for damage in case of defects.

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

If the repair or the substitutions must be made in the place where the machine is installed, the travel and lodging expenses of the Sellers' technicians and operators will be agreed every time.

The Seller will not be held responsible for the defects deriving from materials or projects supplied by the Buyer. The Seller won't be held responsible in case the machine has used incorrectly or differently from what provided by the instruction manual.

The warranty does not comprise defaults or breaks due to normal wear, negligent maintenance, incapability, neglect or misuse of the machine by the Buyer.

The warranty is also excluded in case the payments are not made on due time by the Buyer at the due expiry or if the machine or part of it has been modified or repaired without the Seller's authorization.

The Parts agree that if the material cannot be delivered for reasons not imputable to the Seller's will and responsibility or is delivered with a delay, the Seller's cannot be held responsible for the missing delivery, the delay or the possible applicable defects.

In case of cancellation of the order by the Buyer, the Seller in any case has the right, besides the retention of the advance payments, to a compensation equal to the administrative and production job already carried out.

Exclusions
The following items are excluded from the present supply:
Building works included machinery foundations, underground ducts, utilities passages, support platforms, both in cement and in stainless steel etc.
Factory grounding.
Anti-fire plants.
Ambient air dehumidification plants (antistatic).
Civil works for offices, utilities, etc. including lighting installation, heating, conditioning, drinkable water, sewer, electric energy, insulation, etc.
Electric cabinet of transformation and connections to our power cabinets.
Industrial water ducts.
Air compressor and ducts upstream our distribution panels.
General carpentry structures: operation platforms, safety protections, various materials not being part of the supplied machinery or as required modifications.
Material handling equipment and internal/external transport both for the unloading of the machines from the means for transport and for the assembling operations and for the following handling of the finished products as well as labor.
Accessory machines: raw material pre-treatment plant (drying and/or dehumidification), raw materials mixing and/or dosing system, off-line trims granulation and/or grinding unit, corona treatment unit and/or ennoblement of the finished product, printers, thickness gauges, other accessories.
Mechanic and electric tools: for machinery assembling and maintenance only if they are into the standards.
Materials welding, cutting, drilling tools, work in general.
Oils and lubricating grease, reducer oil and expendable materials in general.
Raw materials for start-up and line testing both carried out preliminarily both at Seller's and Buyer's premises.
Unskilled and skilled labor during the assembling, start-up and testing operations.
Training of Buyer's personnel after the line start-up and testing.
All that is not explicitly indicated in the present offer.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# GENERAL CONDITIONS OF SALES

1.    SUBJECT OF THE SALE

The lines, the machines and the devices described in the Seller's order confirmation make the object of the present contract sub. Attachment A.
The equipment, the machinery and the devices described in the Seller's order confirmation make the "Line".
Any other part of the same, even useful for their functioning, is extraneous if not specifically mentioned.

2.    WARRANTY AND LIABILITY

The Seller warrants to the Buyer that the machines manufactured under this contract is exempt from defects that make them inappropriate for using for a period of 12 months from the date of delivery.

The claims, subject to expiration, must be made known in writing to the Seller within 8 days from their detection and must indicate in details the alleged defects and no-compliances.

The warranty consists of the repair or of the substitution free of charge of the spares defective for faults of the material, of the construction or of the manufacture, only and exclusively if such parts, whenever necessary, are returned to the Seller.

The forwarding costs, the transport fees or any other expense or tax ensuing both from the return of the faulty part and from the dispatch of the new spare, will be exclusively charged to the Buyer.

The Parts agree to exclude the possibility to terminate the contract or any other reward for damage in case of defects.

If the repair or the substitutions must be made in the place where the machine is installed, the travel and lodging expenses of the Seller's technicians and operators will be agreed every time.

The Seller will not be held responsible for the defects deriving from materials or projects supplied by the Buyer. The Seller won't be held responsible in case the machine has used incorrectly or differently from what provided by the instruction manual.

The warranty does not comprise defaults or breaks due to normal wear, negligent maintenance, incapability, neglect or misuse of the machine by the Buyer.

The warranty is also excluded in case the payments are not made on due time by the Buyer at the due expiry or if the machine or part of it has been modified or repaired without the Seller's authorization.

The Parts agree that if the material cannot be delivered for reasons not imputable to the Seller's will and responsibility or is delivered with a delay, the Seller's cannot be held responsible for the missing delivery, the delay or the possible applicable defects.

In case of cancellation of the order by the Buyer, the Seller in any case has the right, besides the retention of the advance payments, to a compensation equal to the administrative and production job already carried out.

3.    RETENTION OF TITLE

The sale is submitted to the retention of title in favour of the Seller. Up to the full and integral payment of the agreed price the property of the goods will be of the Seller. According to the art.1523 c.c., the risks will rest on the Buyer from the moment of delivery.

4.    EXCLUSION OF RESPONSIBILITY

The Seller cannot be held responsible for possible periods of missing production and machine inactivity, nor for any possible defects, even indirect, deriving or anyhow related to them.








SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

Any value as to the hourly output of the Line object of the order is to be considered indicative and, in any case, refers to the use of the Line with known and suitable materials as indicated by the Seller.

5.    CONSERVATION AND CUSTODY
Up to the whole and integral payment of the agreed price, rest on the Buyer the risks ensuing from the custody and the conservation of the sold products.

The Buyer undertakes to provide himself beforehand with an insurance to cover such risks and to inform the Seller about its terms.

6.    CHARGES, EXPENSES AND TAXES
All the expenses, charges and taxes/duties deriving from the present contract are exclusively at the Buyer's charge.

7.    APPLICABLE LAW AND COMPETENT COURT
The contract is regulated by the Italian law with the exception of the conflict rules of such legal order, which are not reminded here. In no case will be applied the Convention of the United Nations on the international sale contracts of movables, approved in Wien on 11.4.1980.

In case of controversy as to the interpretation, the validity and/or the execution of the contract, as well as to any other subject related to the contract, such controversy will be settled and resolved exclusively by the Court of Milan, with the exclusion of any other alternatively competent Court.

8.    MODIFICATIONS OF THE BUYER'S COMPANY
The Buyer will have to inform immediately the Seller of all the company's modifications (for example, but not exhaustive, the company's or concern's transfer, amalgamation, breakup or transformation, renting or transfer of part of the enterprise or similar). The Seller will have the faculty to declare the contract terminated or to terminate it or to pursue the relation.

In any case the original Buyer, wherever possible, will be held responsible joint and several with the subject that took the place.

9.    SUNDRIES
The attachments are integral part of the present contract.

The possible invalidity or ineffectiveness of one or more of the Conditions' agreements won't affect the validity and efficacy of the other agreements that shall have to be considered as valid and efficacious.

According to and a for the effects of the art. 1341 and 1342 c.c., the Buyer declares to accept expressly all the clauses.

10.    AUXILIARY SERVICES INCLUDED
Supply of the layout of the complete line: indication of the connection points to the utilities and details of the foundations.
Supply of 2 copies of the manual for the installation, use and maintenance: as per CE rules, in English/Country of installation language.

 

ATTACHMENT B

PLASTIC TECHNOLOGY SINCE 1950



Since 1950

# ORDER CONFIRMATION

## N. 21/1047_REV.4



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

EXTRUSION LINES FOR FOAM PRODUCTS

www.unionextrusion.it



EXHIBIT
B





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

San Vittore Olona, 04.06.2021

Messers

Our Reference: Sales Dept. FP/ns
Code: ST-CA

Mafcote Inc.
108 Main Street
Norwalk, CT 06851

### Order confirmation n. 21/1047_Rev.4

Attention to: Mr. Steven Schulman
sschulman@mafcote.com
Mr. Fred Schrafft
schrafftie@yahoo.com

### SCOPE OF SUPPLY:

Complete second-hand extrusion line type XPSF-200 for the production of XPS sheet, width 1250 mm, thickness 2 - 5 mm, output 200 kg/h. Line height 4400 mm.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

UNION officine meccaniche S.p.A. Socio Unico
Via 1° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331.519300 - Fax +39 0331.512370 - E-mail: info@unionextrusion.it
C.F. e P.IVA 07641110155 - V.A.T. n.IT07641110155 - Meccc. MI029104
Reg. Imprese n. 238499 - REA MI-1171813 - Cap. Soc. € 2.500.000,00 i.v.

  

CONFINDUSTRIA

www.unionextrusion.it

 

ANAPLAST  CONFINDUSTRIA



Since 1950



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# GENERAL TECHNICAL DATA

| ELECTRICAL | Power supply | 3-phases x 400 V + G (the customer should install the transformer) |
| | Frequency | 50 Hz |
| | Max. power surge | ± 10% |
| | Protection | IP54 |
| | | Atex zone D class 2B for blowing agent dosing device only |

| WATER | Temperature | 8°C |
| | Pressure | max. 4 bar |
| | Hardness | max. 8 - 10° dH |
| | Carbonic acid | max. 50 mg/l |
| | Index of pH | 7.7 - 7.8 |

| COMPRESSED AIR | Line pressure | 6/8 bar |
| | Quality | Filtered and dry |

| ENVIRONMENTAL CONDITIONS | Site location | USA |
| | The line is designed for | indoor installation |
| | Minimum indoor temperature | + 5°C |
| | Maximum indoor temperature | + 40°C |
| | Altitude | ≤ 1000 m see level |

| PAINTING | Machine | RAL 7032 (grey) |
| | Protections | RAL 2000 (orange-yellow) |
| | Switch cabinets | RAL 7032 (grey) |

NOTE 1: All the technical data of the present document are to be considered only indicative and subject to possible revision during the development of the project.

NOTE 2: The "connecting points" needed to connect all the equipment of the line to the utilities (electrical, chilled water, industrial water, compressed-air, gas) must be available at the site of installation and provided by the buyer.

The "connecting points" are more than one along the line.








SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## MAIN DATA

| | |
|---|---|
| Throughput | up to 200 kg/h, depends on sheet thickness and type of the blowing agent used |
| Sheet foam density | min. 40 - 70 kg/cm³, depends on type of the blowing agent used |
| Sheet thickness | 2 - 5 mm (mechanical limits) |
| Coil diameter | max. 2000 mm |
| Sheet width | 1250 mm |
| Mechanical speed | 25 m/min |
| Production speed | 15 m/min |
| Height of screw centreline | 1050 mm |





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES



## LINE COMPONENTS AND PRICE

ITEM 1  N. 1  FEEDING AND GRAVIMETRIC DOSING DEVICE

ITEM 2  N. 1  CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

ITEM 3  N. 1  BLOWING AGENT DOSING DEVICE

ITEM 4  N. 1  STATIC MIXER

ITEM 5  N. 1  EXTRUSION DIE

ITEM 6  N. 1  COOLING RING

ITEM 7  N. 1  COOLING CALIBRATOR APPROX. 398 MM

ITEM 8  N. 1  "S" TAKE-OFF UNIT

ITEM 9  N. 1  TWIN CANTILVER WINDER

ITEM 10  N. 1  ELECTRICAL EQUIPMENT

ITEM 11  N. 1  INSTALLATION AND START-UP
(3 weeks of 5 working days included;
local transport, board & lodge costs excluded)

**TOTAL PRICE CIF LOUISVILLE + CUSTOM DUTY**              €uro   326.000=







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
Ready in Union.

Terms of delivery
CIF Louisville port + custom duty.

Transport
Included in the price.

Packaging
Included in the price.

Terms of payment
- 25% down payment at the order
- 50% against shipping documents
- 20% at installation completed
- 5% at 30 days from start-up

Bank details for transfer:
BANCO BPM S.P.A.
20028 San Vittore Olona (MI)
Italy
IBAN: IT62O0503433791000000048710
Bic: BAPPIT22

Warranty
This is a used (second-hand) extrusion line produced by LMP Impianti s.r.l. and covered by warranty only on mechanical parts not subject to wear for 6 months.

Exclusions
The following items are excluded from the present supply:
Building works included machinery foundations, underground ducts, utilities passages, support platforms, both in cement and in stainless steel etc.
Factory grounding.
Anti-fire plants.
Ambient air dehumidification plants (antistatic).
Civil works for offices, utilities, etc. including lighting installation, heating, conditioning, drinkable water, sewer, electric energy, insulation, etc.
Electric cabinet of transformation and connections to our power cabinets.
Industrial water ducts.
Air compressor and ducts upstream our distribution panels.
General carpentry structures: operation platforms, safety protections, various materials not being part of the supplied machinery or as required modifications.
Material handling equipment and internal/external transport both for the unloading of the machines from the means for transport and for the assembling operations and for the following handling of the finished products as well as labor.
Accessory machines: raw material pre-treatment plant (drying and/or dehumidification), raw materials mixing and/or dosing system, off-line trims granulation and/or grinding unit, corona treatment unit and/or ennoblement of the finished product, printers, thickness gauges, other accessories.
Mechanic and electric tools: for machinery assembling and maintenance only if they are into the standards.
Materials welding, cutting, drilling tools, work in general.
Oils and lubricating grease, reducer oil and expendable materials in general.
Raw materials for start-up and line testing both carried out preliminarily both at Seller's and Buyer's premises,
Unskilled and skilled labor during the assembling, start-up and testing operations.
Training of Buyer's personnel after the line start-up and testing.
All that is not explicitly indicated in the present offer.

 

**BUYER:**
MAFCOTE INC. ("MAFCOTE" or "US")
108 MAIN STREET
NORWALK, CT 06851



**PURCHASE ORDER**

PO# 1311B

**VENDOR:**
Union Officine Meccanice ("Union" or "You")
Via 1 Maggio 12/14
S. Vittore Olona (Mi) Italy 20028

Contact: Ferdinando Passoni
Email: passoni@unionextrusion.it
Phone: +39-033-151-9300

**SHIP TO:**
Royal Consumer Products
1450 S. 10th Street
Louisville, KY 40210

Please send all invoices to:
Steven A. Schulman

| | NET | FREIGHT CHARGES: | none | CARRIER: | | CONFIRM TO: | |
|---|---|---|---|---|---|---|---|
| DATE ORDERED: | 6/24/21 | DATE REQUIRED: | See below | SHIP VIA: | | | |
| FOB DELIVERED; | F A Delivered to our Louisville Plant | | | PURCHASING AGENT: | | TAXABLE / NON TAXABLE: | |
| COMMENTS: | | | | | | | |

## Description of Goods / Services to be Provided

PART 1

To purchase the machine ("Machine") as described in the attached quotation N.21/1047 Rev2 (Attachment A), as superseded by the order confirmation N.21/1047 Rev 4 (Attachment B ) to make product in widths and specifications as detailed in Attachment C and at production output as specified in Attachment C. and subject to these conditions and terms:

1. Price is 326,000 Euro FOB delivered Louisville Plant KY. USA

This includes transportation, duties, handling fees to deliver to our plant located at 1450 south 10th street, Louisville, Ky, USA. It includes supervisors who will direct the direction of installation and commission of the Machine including electrical. (We will supply labor and equipment for installation and other equipment necessary to produce foam. We will provide local room and $15 per day for food). This includes parts ("Mandrel") to make foam in width of 49".

We will pay demurrage charges if product is not unloaded within normal contractor terms for unloading time allowed.

DO NOT SHIP GOODS WITHOUT A WRITTEN ACKNOWLEDGED ORDER WITH PRICES
ORDERS FROM THE ABOVE COMPANY ("BUYER") AND ANY MODIFICATION OF ANY ORDER SHALL HAVE NO FORCE OR EFFECT AND ARE NOT VALID UNLESS AND UNTIL YOU ("SELLER") RECEIVE A WRITTEN PURCHASE ORDER OR MODIFICATION OF THIS FORM SIGNED BELOW BY THE PURCHASING MANAGER AND GENERAL MANAGER OF THE BUYER. FURTHER, IF THIS PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS (CAPITAL ITEMS, LEASES, SERVICE AGREEMENTS, EQUIPMENT ETC.), THIS PURCHASE ORDER AND ANY MODIFICATIONS REQUIRE TWO SIGNATURES, THE SIGNATURE OF THE GENERAL MANAGER OF THE BUYER ENTITY AND ALSO THE SIGNATURE OF AN EXECUTIVE OFFICER OF MAFCOTE. WHEN MAFCOTE IS THE BUYER TWO SIGNATURES ARE STILL REQUIRED FOR A VALID PURCHASE ORDER. IF THE MAFCOTE PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS OR EQUIPMENT, THE PURCHASE ORDER AND ANY MODIFICATIONS REQUIRES THE SIGNATURE OF TWO EXECUTIVE OFFICERS, NO ONE ELSE IS AUTHORIZED TO SIGN THIS ORDER OR MODIFICATION.
INVOICE IN NAME OF AND TO ADDRESS OF ORIGIN, IN DUPLICATE, WITH SHIPPING DOCUMENTS
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS OF PURCHASE ON THE REVERSE SIDE. NONE OF THESE TERMS OR CONDITIONS SHALL BE DEEMED WAIVED, MODIFIED OR ELIMINATED EXCEPT THROUGH A WRITTEN INSTRUMENT SIGNED BY BUYERS' AUTHORIZED AGENTS. PLEASE READ THE TERMS AND CONDITION OF SALE CAREFULLY

_____
AUTHORIZED SIGNATURE

*PAGE 1 OF 3*

_____
AUTHORIZED SIGNATURE

**EXHIBIT**
C

tabbies

**BUYER:**
MAFCOTE INC. ("MAFCOTE" or "US")
108 MAIN STREET
NORWALK, CT 06851



**PURCHASE ORDER**

PO# 1311B

**VENDOR:**
Union Officine Meccanice ("Union" or "You")
Via 1 Maggio 12/14
S. Vittore Olona (Mi) Italy 20028

Contact: Ferdinando Passoni
Email: passoni@unionextrusion.it
Phone: +39-033-151-9300

**SHIP TO:**

Royal Consumer Products
1450 S. 10th Street
Louisville, KY 40210

Please send all invoices to:
  Steven A. Schulman

|  | NET |  | FREIGHT CHARGES: | none | CARRIER: |  | CONFIRM TO: |  |
|---|---|---|---|---|---|---|---|---|
| DATE ORDERED: | 6/24/21 |  | DATE REQUIRED: | See below | SHIP VIA: |  |  |  |
| FOB DELIVERED; | F A Delivered to our Louisville Plant |  |  |  | PURCHASING AGENT: |  | TAXABLE / NON TAXABLE: |  |
| COMMENTS: |  |  |  |  |  |  |  |  |

### Description of Goods / Services to be Provided

Blowing agent is propane or butane or pentane or $CO_2$.

2. Delivery, erecting and commission of Machine: within 120 days of date of this PO and payment of first amount.  Time is of the essence.

3. Product Specifications and Production Speeds and Further Warrantee.  It is represented, warranted and guarantees that the Machine can produce the Product in widths and in the specifications and at the production output as specified per Attachment C.  Warrantee on mechanical parts is 6 months.  Machine fit for purpose. Samples of our foam which comes in white and black ("Product") are being sent with the original of this Purchase Order.

4. Payment terms as follows:
    1-25% with order
    2-50% upon shipment
    3-20% after installation and commission
    4-5% 30 days after installation and commission

DO NOT SHIP GOODS WITHOUT A WRITTEN ACKNOWLEDGED ORDER WITH PRICES
ORDERS FROM THE ABOVE COMPANY ("BUYER") AND ANY MODIFICATION OF ANY ORDER SHALL HAVE NO FORCE OR EFFECT AND ARE NOT VALID UNLESS AND UNTIL YOU ("SELLER") RECEIVE A WRITTEN PURCHASE ORDER OR MODIFICATION OF THIS FORM SIGNED BELOW BY THE PURCHASING MANAGER AND GENERAL MANAGER OF THE BUYER.  FURTHER, IF THIS PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS (CAPITAL ITEMS, LEASES, SERVICE AGREEMENTS, EQUIPMENT ETC.), THIS PURCHASE ORDER AND ANY MODIFICATIONS REQUIRE TWO SIGNATURES, THE SIGNATURE OF THE GENERAL MANAGER OF THE BUYER ENTITY AND ALSO THE SIGNATURE OF AN EXECUTIVE OFFICER OF MAFCOTE.  WHEN MAFCOTE IS THE BUYER TWO SIGNATURES ARE STILL REQUIRED FOR A VALID PURCHASE ORDER.  IF THE MAFCOTE PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00)DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS OR EQUIPMENT, THE PURCHASE ORDER AND ANY MODIFICATIONS REQUIRES THE SIGNATURE OF TWO EXECUTIVE OFFICERS, NO ONE ELSE IS AUTHORIZED TO SIGN THIS ORDER OR MODIFICATION.
*INVOICE IN NAME OF AND TO ADDRESS OF ORIGIN, IN DUPLICATE, WITH SHIPPING DOCUMENTS.
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS OF PURCHASE ON THE REVERSE SIDE.  NONE OF THESE TERMS OR CONDITIONS SHALL BE DEEMED WAIVED, MODIFIED OR ELIMINATED EXCEPT THROUGH A WRITTEN INSTRUMENT SIGNED BY BUYERS' AUTHORIZED AGENTS.  PLEASE READ THE TERMS AND CONDITION OF SALE CAREFULLY.

AUTHORIZED SIGNATURE                                      AUTHORIZED SIGNATURE

**BUYER:**
**MAFCOTE INC.** ("MAFCOTE" or "US")
**108 MAIN STREET**
**NORWALK, CT 06851**



**PURCHASE ORDER**

PO# 1311B

**VENDOR:**
Union Officine Meccanice ("Union" or "You")
Via 1 Maggio 12/14
S. Vittore Olona (Mi) Italy 20028

Contact: Ferdinando Passoni
Email: passoni@unionextrusion.it
Phone: +39-033-151-9300

**SHIP TO:**

Royal Consumer Products
1450 S. 10th Street
Louisville, KY 40210

Please send all invoices to:
Steven A. Schulman

| | NET | FREIGHT CHARGES: | none | CARRIER: | | CONFIRM TO: | |
|---|---|---|---|---|---|---|---|
| DATE ORDERED: | 6/24/21 | DATE REQUIRED: | See below | SHIP VIA: | | | |
| FOB DELIVERED: | F A Delivered to our Louisville Plant | | | PURCHASING AGENT: | | TAXABLE / NON TAXABLE: | |
| COMMENTS: | | | | | | | |

### Description of Goods / Services to be Provided

PART II

To purchase the Mandrels ("Mandrels") to make sizes 29", 41", 45" width form rolls. These mandrels are complete to make such sizes on the Machine.

1. Price: 39,000 Euro FOB Delivered; Delivery by AIR Freight to Louisville Plant KY USA.
2. Delivery: 30 Days prior to commission of Machine.
3. Payment: 75% Upon shipment.
      25 % Upon installation and commission of the Machine.

**DO NOT SHIP GOODS WITHOUT A WRITTEN ACKNOWLEDGED ORDER WITH PRICES**
ORDERS FROM THE ABOVE COMPANY ("BUYER") AND ANY MODIFICATION OF ANY ORDER SHALL HAVE NO FORCE OR EFFECT AND ARE NOT VALID UNLESS AND UNTIL YOU ("SELLER") RECEIVE A WRITTEN PURCHASE ORDER OR MODIFICATION OF THIS FORM SIGNED BELOW BY THE PURCHASING MANAGER AND GENERAL MANAGER OF THE BUYER. FURTHER, IF THIS PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND (\$50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS (CAPITAL ITEMS, LEASES, SERVICE AGREEMENTS, EQUIPMENT ETC.), THIS PURCHASE ORDER AND ANY MODIFICATIONS REQUIRE TWO SIGNATURES, THE SIGNATURE OF THE GENERAL MANAGER OF THE BUYER ENTITY AND ALSO THE SIGNATURE OF AN EXECUTIVE OFFICER OF MAFCOTE. WHEN MAFCOTE IS THE BUYER TWO SIGNATURES ARE STILL REQUIRED FOR A VALID PURCHASE ORDER. IF THE MAFCOTE PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND (\$50,000.00)DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS OR EQUIPMENT, THE PURCHASE ORDER AND ANY MODIFICATIONS REQUIRES THE SIGNATURE OF TWO EXECUTIVE OFFICERS, NO ONE ELSE IS AUTHORIZED TO SIGN THIS ORDER OR MODIFICATION.
**INVOICE IN NAME OF AND TO ADDRESS OF ORIGIN, IN DUPLICATE, WITH SHIPPING DOCUMENTS.**
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS OF PURCHASE ON THE REVERSE SIDE. NONE OF THESE TERMS OR CONDITIONS SHALL BE DEEMED WAIVED, MODIFIED OR ELIMINATED EXCEPT THROUGH A WRITTEN INSTRUMENT SIGNED BY BUYERS' AUTHORIZED AGENTS. PLEASE READ THE TERMS AND CONDITION OF SALE CAREFULLY.

_____
AUTHORIZED SIGNATURE

_____
AUTHORIZED SIGNATURE

TERMS AND CONDITIONS

Page 1 of 1

1. ACCEPTANCE. ...

2. PRICE. ...

3. SHIPPING AND PACKING. ...

4. DELIVERY AND DELAYS. ...

5. INVOICES. ...

6. INSPECTION, ACCEPTANCE AND REJECTION. ...

7. CONFIDENTIAL RELATIONSHIP. ...

8. WARRANTY, INSURANCE, AND INDEMNIFICATION. ...

9. TITLE AND RISK OF LOSS. ...

10. CHANGES. ...

11. INTELLECTUAL PROPERTY. ...

12. DESIGNS. ...

13. TAXES. ...

14. TERMINATION. ...

15. ASSIGNMENT. ...

16. VENUE AND GOVERNING LAW. ...

17. CONFORMANCE. ...

18. INTERPRETATION. ...

19. AUDIT. ...

20. PAYMENT AMOUNT. ...

21. DISCOUNTS. ...

**BUYER:**
MAFCOTE INC. ("MAFCOTE" or "US")
108 MAIN STREET
NORWALK, CT 06851

 **Mafcote**

# PURCHASE ORDER

PO# 1324B

**VENDOR:**
Union Officine Meccanice ("Union" or "You")
Via 1 Maggio 12/14
S. Vittore Olona (Mi) Italy 20028

Contact: Ferdinando Passoni
Email: passoni@unionextrusion.it
Phone: +39-033-151-9300

**SHIP TO:**

Royal Consumer Products
1450 S. 10th Street
Louisville, KY 40210

Please send all invoices to:
Steven A. Schulman

| | NET | FREIGHT CHARGES: | none | CARRIER: | | CONFIRM TO: | |
|---|---|---|---|---|---|---|---|
| DATE ORDERED: | 7/18/21 | DATE REQUIRED: | See below | SHIP VIA: | | | |
| FOB DELIVERED; | F A Delivered to our Louisville Plant | | | PURCHASING AGENT: | | TAXABLE / NON TAXABLE: | |
| COMMENTS: | | | | | | | |

## Description of Goods / Services to be Provided

1-The PO is for 50% of the duty due to the US Customs to be paid to Union upon release of the Machine bought under PO 1311B as per the attached email dated 7/16/21 at 11:30am. Estimated cost is $3782.00 USD for our share of the duty.

2-PO 1311B is hereby reinstated with all terms as is, including the reaffirmation of the representation and warrantee regarding conversion of electric input from European to American electricity as expressed in the attached email date 7/16/21 at 4:24 am.

DO NOT SHIP GOODS WITHOUT A WRITTEN ACKNOWLEDGED ORDER WITH PRICES
ORDERS FROM THE ABOVE COMPANY ("BUYER") AND ANY MODIFICATION OF ANY ORDER SHALL HAVE NO FORCE OR EFFECT AND ARE NOT VALID UNLESS AND UNTIL YOU ("SELLER") RECEIVE A WRITTEN PURCHASE ORDER OR MODIFICATION OF THIS FORM SIGNED BELOW BY THE PURCHASING MANAGER AND GENERAL MANAGER OF THE BUYER. FURTHER, IF THIS PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS (CAPITAL ITEMS, LEASES, SERVICE AGREEMENTS, EQUIPMENT ETC.), THIS PURCHASE ORDER AND ANY MODIFICATIONS REQUIRE TWO SIGNATURES, THE SIGNATURE OF THE GENERAL MANAGER OF THE BUYER ENTITY AND ALSO THE SIGNATURE OF AN EXECUTIVE OFFICER OF MAFCOTE. WHEN MAFCOTE IS THE BUYER TWO SIGNATURES ARE STILL REQUIRED FOR A VALID PURCHASE ORDER. IF THE MAFCOTE PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS OR EQUIPMENT, THE PURCHASE ORDER AND ANY MODIFICATIONS REQUIRES THE SIGNATURE OF TWO EXECUTIVE OFFICERS, NO ONE ELSE IS AUTHORIZED TO SIGN THIS ORDER OR MODIFICATION.
*INVOICE IN NAME OF AND TO ADDRESS OF ORIGIN, IN DUPLICATE, WITH SHIPPING DOCUMENTS.
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS OF PURCHASE ON THE REVERSE SIDE. NONE OF THESE TERMS OR CONDITIONS SHALL BE DEEMED WAIVED, MODIFIED OR ELIMINATED EXCEPT THROUGH A WRITTEN INSTRUMENT SIGNED BY BUYERS' AUTHORIZED AGENTS. PLEASE READ THE TERMS AND CONDITION OF SALE CAREFULLY.

AUTHORIZED SIGNATURE                                          AUTHORIZED SIGNATURE

REVERSE SIDE OF PURCHASE PORDER TERMS AND CONDITIONS

Page 1 of 1

1.  ACCEPTANCE. This order is accepted by Seller delivering Seller's written acceptance to Buyer within ten (10) days of the order's date. Any proposal for additional or different items or any attempt by Seller to vary, in any degree, any of the terms of this purchase order in Seller's acceptance shall not operate as a rejection of this purchase order unless the variance is in the terms of the description, quantity, price or delivery schedule of the goods, but shall be deemed a material alteration hereof, and this purchase order shall be deemed accepted by Seller without the material alteration. If this purchase order shall be deemed an acceptance of a prior offer by Seller, the acceptance is limited to the express terms contained on the face and reverse side hereof. This order, with any Buyer attachments, constitutes the complete agreement of the parties. No waiver or other modification, deletions or additions to the terms of this order shall be valid or enforceable unless in writing and signed by authorized representatives of both parties. No requests or attempts to modify any of the terms of this purchase order shall be binding on Buyer unless made in writing and signed by Buyer's authorized representatives.

2.  PRICE. Buyer shall not be billed at prices higher than those stated on the front of this order. Unless otherwise specified, the price stated includes all charges for packing, hauling, storage and transportation to point of delivery (F.O.B. destination). Seller will pay all delivery charges in excess of any delivery charge Buyer has agreed to pay. The price stated includes all taxes except state or local sales or use tax or similar taxes which Seller is required by law to collect from Buyer. Such taxes, if any, shall be separately stated in Seller's invoice and paid by Buyer unless an exemption is available. Seller agrees that any price reduction, rebate or discount made with respect to the type of goods covered by this order after its placement but before receipt of the goods at the invoice, whichever is later, will be applicable to this order.

3.  SHIPPING AND PACKING. Substitutions will not be accepted. Seller shall be responsible for safe and secure packing and shall separately mark and number all cases, packages, etc. showing the corresponding numbers on the invoices; and, an itemized packing slip bearing the Buyer's order number must be placed on each container. No extra charges shall be added for cartons, packing, boxing, delivery, drayage or other costs unless authority for such charges is expressly incorporated in this order. The order must be shipped complete by the date requested but must not be shipped more than one week in advance of the time or times specified herein without Buyer's prior written approval. When more than one shipment is made against any order, indicate 'Final Shipping' on shipping papers and invoice accompanying the last shipment in the order. Seller shall not ship excess quantities without Buyer's prior written approval. Except as otherwise provided herein, Buyer shall not be obligated to accept overages, excess or under shipments and such shipments, in whole or in part may, at Buyer's option, be returned to Seller or held for disposition at Seller's expense and risk. Seller shall invoice all shipments in triplicate. The invoice shall describe the items, state the purchase order number and be attached to the original bill of lading or other shipping receipt. For broken of freight services, the carrier is deemed to be your agent for purposes of this bill of lading and proof of delivery.

4.  DELIVERY AND DELAYS. The shipping date is specified on the front of this order. Time is of the essence for deliveries under this order. Buyer reserves the right to cancel the order and reject the goods upon default in time, rate of manner of delivery. Buyer also reserves the right to refuse or suspend deliveries in the event of contingencies beyond Buyer's control, including, by example, labor disputes, acts of God, extreme weather, government restrictions, changes in laws and regulations, commercial impracticability, acts of terrorism, embargos or declaration of war.

5.  INVOICES. Within 24 hours after shipment, one copy of the packing slip, bill of lading and other shipping documents, together with an invoice bearing the Buyer's purchase order number must be mailed to the Buyer at the office specified herein.

6.  INSPECTION, ACCEPTANCE AND REJECTION. All goods ordered hereunder will be subject to inspection and testing by Buyer, and to the extent practicable and at all times and places, including the period of manufacturing; and in all circumstances, before effective acceptance. Seller agrees to permit access to Seller's facilities at all reasonable times for inspection of goods by Buyer's agents or employees and will provide all tools, facilities and assistance reasonably necessary for such inspection at no additional cost to Buyer. Such goods will also be subject to final inspection and acceptance by Buyer after delivery to Buyer. Inspections and/or payments by Buyer before delivery will not constitute final acceptance. If the goods delivered do not meet the specifications or otherwise do not conform to the requirements of this order, Buyer shall have the right to reject such goods. Goods which have been delivered and rejected in whole or in part may, at Buyer's option, be returned to Seller or held for disposition at Seller's risk and expense. Notwithstanding (i) any inspection of the source by Buyer; (ii) the delivery of goods to the F.O.B. destination; or (iii) any prior payment, all shipments are subject to final inspection and acceptance at Buyer's facility or plant before acceptance is effective. No inspection or test made before the final inspection or acceptance shall relieve Seller of any responsibility for defects or for any other failure to meet the specifications or requirements of this order. Seller shall provide and maintain a quality control system, acceptable to Buyer, covering the goods to be furnished hereunder. Where specifications are omitted from this order and absent specific instructions from the Buyer, Seller shall supply goods of similar specifications to those goods previously supplied to Buyer for the same/intended purpose. In the event specifications are omitted, where such goods have not been previously supplied to Buyer, the Seller must request written instructions from the signer of this order and receive those instructions in writing before processing the order. If any goods are found to be defective or otherwise do not conform to the specifications or requirements of this order, Buyer, in addition to its other rights, may reject such goods and require prompt correction or replacement at Seller's expense, including shipping and packing charges. If Seller fails to proceed promptly with such replacement or correction, Buyer may, by contract or otherwise, exercise the right of cover, replace and/or correct the defective or nonconforming goods; and Seller shall be liable to Buyer for all additional expenses and losses incurred by Buyer, including any consequential losses. Rejected goods will not be resubmitted for acceptance without concurrent written notice of the prior rejection. In addition to its other remedies, Buyer may charge back to Seller's account the amount paid for the rejected or nonconforming goods pending redelivery.

7.  CONFIDENTIAL INFORMATION. Seller agrees to treat all information, prototypes, samples, drawings and designs ('Information') furnished by the Buyer as strictly secret, proprietary and confidential, and, absent prior written consent of Seller's authorized officer, agrees to prevent the use or reproduction, by, or disclosure or other dissemination of the Information to, any person, firm or corporation. Seller shall not grant access or disclose any Information to Seller's employees, agents or consultants, other than to those employees in Seller's permanent employ to whom such disclosure is necessary for the effective performance hereunder and for production of the goods and only if such employees are bound by written agreement to maintain confidentiality of Information disclosed to them. Seller shall not by any manner advertise, photograph, publish, announce or release for publication any photograph or statement mentioning Buyer or that Seller has furnished or contracted to furnish the goods required by this order.

8.  WARRANTY, INSURANCE, AND INDEMNIFICATION. (a) Seller warrants to Buyer that the goods will, at the time of shipment conform to the requirements of this order, to the approved specifications and to the description on the face (front) of this order, that Seller shall convey good title to the goods, that such goods will be delivered free from any security interest or other any lien or encumbrance, and that such goods will be free from defects in material and workmanship. In addition, goods shall carry a warranty consistent with any warranty included in the specifications, provided to Seller by Buyer. Seller represents and expressly warrants that all goods ordered according to specifications or sample furnished or approved by Buyer shall conform thereto in all respects and in all events will be suitable for the purpose intended and will be merchantable and of first quality and workmanship and free from defects in design, material and workmanship. Where specifications are omitted in the purchase order and in the absence of specific instruction from Buyer, Seller shall supply goods of similar specifications as those previously supplied to Buyer for the same purpose. Seller warrants that the goods so supplied shall be of the same quality and workmanship as those previously supplied and shall be free from defects in design, material and workmanship. Where such goods have not been previously supplied to Buyer and the Seller receives instructions from Buyer in writing, Seller warrants that the goods will conform to Buyer's instructions in all respects. These representations and warranties are jointly and severally enforceable by Buyer and by all persons to whom the goods may be sold, resold or transferred by Buyer and no in addition to any and all warranties, both expressed and implied, under the Uniform Commercial Code as adopted by Connecticut. Buyer may charge back and withhold the amount paid for nonconforming or defective goods pending Seller's compliance with its warranty obligations hereunder.

    (b)   If requested by Buyer, Seller shall maintain comprehensive liability, product liability and related insurance to protect Buyer for any loss, injury, damages and claims in connection with use or harmful goods.

    (c)   Seller shall indemnify, defend and hold Buyer harmless from and against any harm, all claims, litigation, loss and damages, whether direct, indirect, consequential and exemplary or otherwise relating to or resulting from any action or inaction by Seller in relation to this order, Seller's failure to comply with all applicable laws, the infringement of any patent, trademark or copyright as the result of any sale, resale or use of the goods delivered hereunder, all claims relating to California's Proposition 65 (Cal. Health & Safety Code § 25249.6 et seq.), the nonconformance of the delivered goods to Buyer's approved specifications, and any dangerous, defective or defective goods delivered hereunder. This indemnification shall extend to all losses, damages, if any, court costs, penalties, fees and disbursements and reasonable attorneys and expert witness fees incurred by Buyer in pursuing or defending any claim, proceeding or litigation. Buyer shall be entitled to pre-judgment interest on all claims associated herewith in the amount of ten percent (10%) per annum.

9.  TITLE AND RISK OF LOSS. Title to all goods to be delivered hereunder shall remain in the Seller until such goods are delivered to Buyer at the destination location specified on the front side of this order and until Buyer conducts a final inspection of the goods and accepts the goods. All risk of loss or of damages to goods delivered by Seller hereunder shall be on Seller until title to such goods passes to Buyer at destination, and Seller shall bear all risk of loss and damage to goods rejected by Buyer after notice of rejection and until such goods are redelivered to Buyer. If material is furnished by Buyer for performance of this order, all risks of loss and damage to such material shall remain on Seller until the material has been delivered to the Buyer.

10. CHANGES. Buyer may, at any time before shipment for stock goods or before the manufacture of order for specially made goods, in its sole discretion, by written instruction to Seller, signed by a duly authorized agent: (a) Change the shipping and packing instruction; (b) Increase or decrease the quantity of goods ordered; (c) Change the drawings, design or specifications; and/or (d) Change the delivery schedule. Seller shall proceed promptly to make such increase/decrease or changes in accordance with the terms of the written instruction. If the instructions cause an increase or decrease in the price of the goods under this order, Seller shall promptly notify Buyer of such changes in price, and Buyer shall, in its sole discretion, have the right to accept or reject such goods. Except as may be directed or agreed to in writing by Buyer's duly authorized agent, Seller shall not make any changes in the shipping or packing instructions, quantity of goods ordered, delivery schedules, or any other aspect of performance under this order. Seller must timely notify Buyer's duly authorized agent within ten (10) days after the receipt of the instructions of any conditions or changes which are unacceptable to the Seller. Upon such notification by the Seller, Buyer's duly authorized agent may either alter the instructions to change the order to agree mutually upon conditions or terminate the order without cost or liability to Buyer.

11. INTELLECTUAL PROPERTY. Seller represents that the goods furnished hereunder do not infringe upon or otherwise violate any patent, trademark or copyright held by a third party.

12. DESIGNS. Buyer shall retain title to any designs, sketches or drawings furnished by or paid for by Buyer in connection with this order. All designs shall be recorded and identified as the Buyer's property, maintained in good condition, insured for benefit of Buyer, and be safeguarded by Seller at the Seller's risk and be replaced by Seller if lost, damaged or destroyed. The designs, sketches or drawings shall be used exclusively in the production of the goods required by this order, and shall not be used for production of larger quantities than those specified herein, or in the production, manufacture or design of any goods or products for any other person without Buyer's written consent.

13. TAXES. Except as otherwise provided herein and unless prohibited by statute, Seller agrees to pay any federal, state or local tax of any kind or nature which may be imposed upon the goods ordered hereunder, or by reason of their sale or delivery.

14. TERMINATION. (a) For default. Buyer may terminate this order, or any part hereof, without liability, by written or electronic notice of default to Seller under any of the following conditions: (i) Seller neglects, refuses or fails to produce the goods and make deliveries within the time specified or extensions agreed to in writing by Buyer's duly authorized agent; (ii) If Seller fails to comply with any other provisions of this order or fails to make timely progress toward completion or fulfillment of this order, and does not cure any such failure within a period of ten (10) days (or such longer period as Buyer may authorize) after written notice from Buyer specifying such failure; or (iii) If Seller becomes insolvent, is subject to proceedings under any law relating to bankruptcy, insolvency or the relief of debtors, or otherwise fails to satisfactorily written assurance of performance if determined by the Buyer. In the event of such termination, Buyer may purchase similar goods elsewhere and otherwise cover and secure replacement of the goods, and Seller shall be liable to the Buyer for any additional expenses and increased costs to procure such goods. Seller shall continue timely performance of this order to the extent not terminated.

    (b)   For convenience. Buyer reserves the right in its sole discretion to, and may at any time, terminate this order, or any part hereof, by written, oral or electronic notice for its convenience. In the event of such termination, Buyer will pay Seller's direct costs incurred to the date of action and termination, which must be verified and determined in accordance with generally accepted accounting principles. Seller shall not be entitled to any other damages whatsoever, including consequential or punitive damages. Goods produced or partially produced (work in progress and materials) hereunder, upon such payment, shall become Buyer's property.

15. AUDIT. Seller shall keep adequate accurate and complete records of chargeable hours of direct labor and all costs of materials used in the performance of this order, which shall be subject to audit by Buyer in the event of termination, dispute, or with any other order for which the price is based on time and cost of material.

16. ASSIGNMENT. Seller shall not assign this order and shall not contract, subcontract or delegate any duty or obligation under order without Buyer's advance written approval.

17. VENUE AND GOVERNING LAW. This agreement shall be governed, construed and enforced in accordance with the laws of the state of origin of this purchase order. The parties agree that the courts of the state of the origin of this purchase order and the federal courts located therein, shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. The Uniform Law on the Formation of Contracts for the Sale of Goods based on the United Nations Convention on Contracts for the International Sale of Goods shall not be applicable and all the terms of this purchase order must be construed in accordance with the Uniform Commercial Code as enacted in the state of origin of this purchase order.

18. CONFORMANCE WITH APPLICABLE LAWS. Seller warrants and represents that the manufacture of the goods and the full performance of all manufacturing and related services hereunder to produce the goods have been accomplished in strict conformity with all applicable federal, state and local laws governing such manufacture and performance, including all consumer product safety laws (including but not limited to Consumer Product Safety Act, the Consumer Product Safety Improvement Act, California Topics in Packaging Prevention Act, California Proposition 65), and laws relevant to the working conditions and wages of the personnel engaged in such manufacture and production. Seller warrants and represents that the goods either do not contain chemicals known to the State of California to cause cancer or reproductive toxicity, or that the quantity of the chemical(s) in question is in compliance with applicable state and federal laws, including California Proposition 65.

19. INTERPRETATION. The parties agree that the provisions of this purchase order shall not be construed in favor of or against either party by reason of the extent to which a party or its professional advisors participate in the preparation and drafting of the purchase order. This purchase order comprises the complete and final agreement between Seller and Buyer and supersedes all prior negotiations, proposals, representations, commitments, understandings or agreements between the Buyer and Seller, either written or oral, or the subject of other agreements, quotations or acknowledgments.

20. PAYMENT AMOUNT. Anything to the contrary notwithstanding, in the event of a good faith dispute and Buyer considers to be the proper amount (or amount less on bona fide offset) and a court later determines that further amounts are due Seller, such payments shall be without interest, penalty or other fees of any kind whatsoever.

21. DISCOUNTS. Price discounts will be based on the date of invoice or on the date of products or services are received by the Buyer, whichever is later. No late charges will be assessed unless Seller has provided Buyer's Chief Executive Officer advance notice.

ATTACHMENT A

PLASTIC TECHNOLOGY SINCE 1950



Since 1950

# QUOTATION

## N. 21/1047_REV.2



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

www.unionextrusion.it





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

---

San Vittore Olona, 13.04.2021

Our Reference: Sales Dept. FP/ns
Code: ST-CA

**Quotation n. 21/1047_Rev.2**

Messers

**Matcote Inc.**
108 Main Street
Norwalk, CT 06851

*Attention to:* Mr. Steven Schulman

## SCOPE OF SUPPLY:

Complete second-hand extrusion line type XPSF-200 for the production of XPS sheet, width 1250 mm, thickness 2 - 5 mm, output 200 kg/h.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

**UNION officina meccaniche S.p.A.** Socio Unico
Via 1° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331.519350 - Fax +39 0331.519370 - E-mail: info@unionextrusion.it
C.F. e P.IVA 07664110155 - V.A.T. nr. IT07664110155 - Meec. 89109104
Reg. Imprese n. 29499 - REA nr. 1171813 - Cap. Soc. € 2.500.000.00 i.v.

  

w w w . u n i o n e x t r u s i o n . i t

---

 



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES



## GENERAL TECHNICAL DATA

| ELECTRICAL | Power supply | 3-phases x 400 V + G |
| | Frequency | 50 Hz |
| | Max. power surge | $\pm$ 10% |
| | Protection | IP54 |
| | | Atex zone D class 2B for blowing agent dosing device only |

| WATER | Temperature | 8°C |
| | Pressure | max. 4 bar |
| | Hardness | max. 8 - 10° dH |
| | Carbonic acid | max. 50 mg/l |
| | Index of pH | 7.7 - 7.8 |

| COMPRESSED AIR | Line pressure | 6/8 bar |
| | Quality | Filtered and dry |

| EQUIPMENT DESIGN | Piping | ASTM - ANSI |
| | Instrumentation | ISA |
| | Electrical | IEC - EN - 2014/35/UE - 2014/30/UE |

| ENVIRONMENTAL CONDITIONS | Site location | USA |
| | The line is designed for | indoor installation |
| | Minimum indoor temperature | + 5°C |
| | Maximum indoor temperature | + 40°C |
| | Altitude | ≤ 1000 m see level |

| PAINTING | Machine | RAL 7032 (grey) |
| | Protections | RAL 2000 (orange-yellow) |
| | Switch cabinets | RAL 7032 (grey) |

| DOCUMENTATION | Manuals | Italian, English |
| | Labels on the line | English |
| | Operator panel | English |

NOTE 1:    All the technical data of the present document are to be considered only indicative and subject to possible revision during the development of the project.

NOTE 2:    The "connecting points" needed to connect all the equipment of the line to the utilities (electrical, chilled water, industrial water, compressed-air, gas) must be available at the site of installation and provided by the buyer.

The "connecting points" are more than one along the line.

The correct positioning of each "connecting point" will be made known to the buyer upon delivery of the final drawings of the line which must be signed for acceptance before starting the manufacturing of the line.

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## MAIN DATA

| | |
|---|---|
| Throughput | up to 200 kg/h, depends on sheet thickness and type of the blowing agent used |
| Sheet foam density | min. 40 - 70 kg/cm³, depends on type of the blowing agent used |
| Sheet thickness | 2 - 5 mm (mechanical limits) |
| Coil diameter | max. 2000 mm |
| Sheet width | 1250 mm (to be defined during the order) |
| Mechanical speed | 25 m/min |
| Production speed | 15 m/min |
| Height of screw centreline | 1050 mm |







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## LINE COMPONENTS AND PRICE

ITEM 1   N. 1     FEEDING AND GRAVIMETRIC DOSING DEVICE

ITEM 2   N. 1     CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

ITEM 3   N. 1     BLOWING AGENT DOSING DEVICE

ITEM 4   N. 1     STATIC MIXER

ITEM 5   N. 1     EXTRUSION DIE

ITEM 6   N. 1     COOLING RING

ITEM 7   N. 1     COOLING CALIBRATOR APPROX. 398 MM

ITEM 8   N. 1     "S" TAKE-OFF UNIT

ITEM 9   N. 1     TWIN CANTILVER WINDER

ITEM 10   N. 1     ELECTRICAL EQUIPMENT

ITEM 11   N. 1     INSTALLATION AND START-UP
                     (3 weeks of 5 working days included;
                     local transport, board & lodge costs excluded)

**TOTAL PRICE FOB GENOVA**                  €uro    336.200=







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# DESCRIPTION

ITEM 1    N. 1    FEEDING AND GRAVIMETRIC DOSING DEVICE

Suction conveying device for 5 components.
Gravimetric dosing device for 5 components.

| | |
|---|---|
| Throughput | max. 300 kg/h |
| Dosing accuracy | ± 0.5% |
| Motor | a.c. with inverter |

The different components can be dosed in the following ranges:

| Component A | PS virgin | 5 - 50% |
|---|---|---|
| Component B | PS recycled | 10 - 100% |
| Component C | Nucleating agent | max. 2% |
| Component D | Talcum | max. 2% |
| Component E | Colour masterbatch | max. 2% |

All components in form of granulates are fed to a gravimetric dosing device.

The dosing device is operated from the main panel of the line.

The dosing device allows to store up to 200 recipes.

ITEM 2    N. 1    CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

| | |
|---|---|
| Screw diameter | 127 mm |
| L/D ratio | 32 |
| Screw speed | max. 50 rpm |
| Driving power | a.c. motor of 95 kW |

**Barrel**
Two barrels in nitrided steel (material LK3) with a surface hardness of more than 115 HRC. The first barrel provided with one bore for the injection of the blowing agent arranged on a barrel length of 10 D. The first barrel includes also the feeding section.

**Screws**
Each screw in one piece with a central bore for cooling in front of the second barrel of the extruder. The profile of the screws is designed corresponding to the process and material data. Screw material is nitrided steel (material LK3) with a surface hardness of more than 110 HRC.

**Heating/cooling zones**

No. 1 cooling zone for the feeding section cooled directly with the cooling water of the customer. The water flow is regulated by a temperature control.

No. 4 heating/cooling zones equipped with electrical heaters located on the first barrel.

No. 2 cooling zones with thermal oil.

External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.

 

 

SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

**Reduction gear**

Service factor            AGMA min. 1.8 – 2.0
Starting torque           1.25 fold nominal torque
Lifetime of bearings      min. 25.000 hours

The reduction gear is directly coupled to the driving motor by a Mayer safety coupling.

**Barrel supports**
Two supports which move along rails to compensate the longitudinal thermal extension.

**Base frame**
Sectional steel construction for gear unit, motor and barrel supports. The lower part of the frame is completely closed with inside the connection boxes for all users in Atex.

**Accessories**
Screw ejection tool manually operated.

ITEM 3    N. 1    BLOWING AGENT DOSING DEVICE

Consisting of one blowing agent dosing device for max. 50 l/h of hydrocarbons.

The device includes:

- no. 1 diaphragm pump with 3 membranes
- no. 1 injection valve
- no. 1 flow meter with signal transducer
- no. 1 flow regulator

The device is mounted on a steel rack to be installed outside.
The electric equipment is mounted in the switch cabinet of the extrusion line.

The rack and all the piping of the dosing devices toward the extruder are made in AISI 316 stainless steel. The supply includes the piping for a max. distance between dosing devices and extruder of 10 m.

Protection class Atex.

ITEM 4    N. 1    STATIC MIXER

The static mixer positioned between the extruder and the wide extrusion die is used to homogenize the temperature of the melt.

The static mixer is connected to the extruder and the die by clamps heated with electric heaters of 1.5 kW on each side. The temperature can be regulated.

Diameter            115 mm
Length              6 D

Body in hardened and tempered steel with mixing elements in stainless steel AISI 316, internal chamber for heating/cooling by thermal oil.

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.

The pressure and the temperature of the melt is measured before and after the static mixer.

The support of the static mixer is fixed to the support of the extruder.

ITEM 5     N. 1     EXTRUSION DIE

Die diameter                                   115 mm
Gap opening                                    manual adjusting

The temperature of the die is controlled by no. 2 heating/cooling zones.

External cooling by water, indirectly by heat-exchanger. Temperature is controlled by an electronic device.

At the end of the die a ring is applied, cooled by water, to finish the external side of the sheet.

ITEM 6     N. 1     COOLING RING

The cooling ring mounted on the carriage moving on rails is used to cool the external side of the sheet. The cooling is done by the blower with a motor of 2.5 kW. The air is blown along the whole circumference of the sheet before the longitudinal cutting.

At the end of the die the ring is applied, cooled by water, to finish the external side of the sheet.

ITEM 7     N. 1     COOLING CALIBRATOR APPROX. 398 MM

The cooling calibrator is mounted on the carriage moving on rails.

The calibrator is in one cooling zone in order to guarantee a gradual and uniform cooling.

In the front side of the calibrator the air is blown to expand the tubular sheet coming from the die.

On the carriage of the calibrator two blades are also fixed for the longitudinal cutting of the sheet.

ITEM 8     N. 1     "S" TAKE-OFF UNIT

Unit has no. 2 rubberized rolls, one above the other, around which the sheet moves according to an "S".

Diameter of rolls                              400 mm
Width of rolls                                 1500 mm

The rolls have a double wall for a possible cooling ring in the future.

No. 2 rolls are driven by a gear motor of 5.5 kW controlled by an inverter.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

On the first roll a pressure roller is applied, the pressure is regulated pneumatically.

At the end of the unit an idle roller is provided to guide the sheet to the winder.

ITEM 9   N. 1     TWIN CANTILVER WINDER

The winder is formed by two thick steel sheets connected together.

Expansion shafts no.            2
Diameter of expansion shafts   300 mm
Width of expansion shafts       max. 1300 mm
Width of sheet                  max. 1240 mm
Diameter of coils               max. 2000 mm
Winding speed                   max. 50 m/min
Driving motors                  4.5 kW each

The sheet is winded manually by adhesion on the expansion shaft. Once reached the requested diameter the coil is automatically extracted from the winding station by means of a pneumatic device.

ITEM 10   N. 1     ELECTRICAL EQUIPMENT

1 a.c. main drive for the extruder
1 a.c. drive for the carriage of the cooling ring
1 a.c. drive for the carriage of the cooling calibrator
1 a.c. drive for the "S" take-off unit
2 a.c. drives each for the winder
1 gravimetric feeding and dosing device
3 pressure/temperature devices of the melt
1 blowing agent dosing device
5 electrical heating/cooling zones
6 oil heating/cooling zones
4 water cooling zone
1 oil cooling zone

Other two small local desks located one near the winder and the other near the "S" take-off unit and rewinding.

ITEM 11   N. 1     INSTALLATION AND START-UP

3 weeks of 5 working days included.
Local transport, board & lodge costs excluded.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
Ready in Union.

Terms of delivery
FCA Seller's factory in San Vittore Olona (MI) according to Incoterms® 2020 I.C.C. Paris.

Transport
Not included in the price.

Packaging
Not included in the price.

Terms of payment
- 30% down payment at the order
- 70% before delivery

Preliminary test
A test of the line will be carried out in Seller's factory.
The necessary raw materials are at Buyer charge.
The terms and conditions of the preliminary test shall be commonly agreed by the parties upon signing of the contract and indicated as separate Annex 1, in any case as integral part of the contract.

The Buyer shall have to delegate one of his technicians authorized to sign the preliminary test protocol. In case the Buyer does not request to attend the testing, he won't be in a position to contest the result of the same. The test will be considered positive if the Buyer has not requested to attend it.

The machinery, the equipment and the accessories necessary for the line operation, when bought separately by the Buyer, shall have to be delivered and installed at Seller's premises at the diverse suppliers' charge at least 15 days before the date of the provided test. It's acknowledged that in any case the Seller is not responsible of the correct functioning of these parts if they are supplied by the Buyer and not making part of the supply.

Installation
The installation of the line means the placement, assembling, alignment, fixing and connection of all the equipment and accessories at the right place on site, made by Seller's specialist with the support of Buyer's personnel and handling equipment to be provided by the Buyer (cranes, forklifts etc.).

Placement:
Means the positioning of the equipment, at the right place, on site of installation.

Assembling:
Means the re-assembling on site of all the parts that was dismounted for shipping purpose.

Alignment:
Means the position of all the equipment securing the perfect alignment among them, using the right tools and technique.

Fixing:
Means the drilling and fixing on floor of each equipment and accessory supplied by the Seller.

Connection:
Means the connection of power, water, air, gas from the "connection points" available on site to all the equipment along the line.

The Seller's specialist will arrive on site and begin the installation only when the Buyer communicate by writing to the Seller the readiness of the following works on Buyer side:

- All the "connection points" for the connection of the equipment to the utilities (electrical power, chilled water, compressed air, industrial water, gas) are ready at the agreed place/s, as foreseen in the final lay-out undersigned by the parties before starting the manufacturing phase.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

- The air-ducts to place the electrical cables from the main electric desks to each equipment and to the remote operating panel/s shall be ready for the assembling and it shall have the size, dimension and route, like indicated in the official lay-out undersigned by the parties before the manufacturing.

- All the equipment necessary for the installation and commissioning (not delivered by Seller but supplied by the Buyer) shall be available at site and ready for working.

- All the adequate equipment needed for the movement and lift of the machineries, like forklift and/or crane shall be available at site.

<u>Costs:</u>
The cost of the installation is not included in the present quotation and will be charged separately as per the following terms:

- Daily cost for one specialist each weekday (from Monday to Friday)..........................................................1000€/day
- Daily cost for one specialist each holiday (Saturday, Sunday)..........................................................................1200€/day

- Travel costs (flight/rental car/taxi)..........................................................................................to be charged at cost
- Hotel accommodation & Food.................................................................................................to be charged at cost

Final Commissioning & Training
The Final Commissioning of the line can start when the installation is concluded, that means the line can be switch-on and is ready for the dry and wet test.

The training of Buyer's personnel will be done by Seller's specialist when the Final commissioning is completed and accepted.

The terms and conditions of the Final Commissioning shall be commonly agreed by the parties upon signing of the contract and indicated as separate Annex 2, in any case as integral part of the contract.

<u>Dry test:</u> Means the test without material made to verify the correct functioning of all the parts of the line and its accessories, signals and safety alarms.

<u>Wet test:</u> The upstream will be tested and accepted when running with the material and when the performance commonly agree by the parties upon signing the contract are satisfied.

<u>Costs:</u>
The cost for the commissioning and training is not included in the present quotation and will be charged separately as per the following terms:

- Daily cost for one specialist each weekday (from Monday to Friday)..........................................................1000€/day
- Daily cost for one specialist each holiday (Saturday, Sunday)..........................................................................1200€/day

- Travel costs (flight/rental car/taxi)..........................................................................................to be charged at cost
- Hotel accommodation & Food.................................................................................................to be charged at cost

*The estimates for the installation, commissioning and training are subject to variables and contingencies at site, for this reason shall be intended just as indicative and it doesn't constitute any responsibility for the Seller.

Warranty
The Seller warrants to the Buyer that the machines manufactured under this contract is exempt from defects that make them inappropriate for using for a period of 12 months from the date of delivery.

The claims, subject to expiration, must be made known in writing to the Seller within 8 days from their detection and must indicate in details the alleged defects and no-compliances.
The warranty consists of the repair or of the substitution free of charge of the spares defective for faults of the material, of the construction or of the manufacture, only and exclusively if such parts, whenever necessary, are returned to the Seller.
The forwarding costs, the transport fees or any other expense or tax ensuing both from the return of the faulty part and from the dispatch of the new spare, will be exclusively charged to the Buyer.

The Parts agree to exclude the possibility to terminate the contract or any other reward for damage in case of defects.

 



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

If the repair or the substitutions must be made in the place where the machine is installed, the travel and lodging expenses of the Sellers' technicians and operators will be agreed every time.

The Seller will not be held responsible for the defects deriving from materials or projects supplied by the Buyer. The Seller won't be held responsible in case the machine has used incorrectly or differently from what provided by the instruction manual.

The warranty does not comprise defaults or breaks due to normal wear, negligent maintenance, incapability, neglect or misuse of the machine by the Buyer.

The warranty is also excluded in case the payments are not made on due time by the Buyer at the due expiry or if the machine or part of it has been modified or repaired without the Seller's authorization.

The Parts agree that if the material cannot be delivered for reasons not imputable to the Seller's will and responsibility or is delivered with a delay, the Seller's cannot be held responsible for the missing delivery, the delay or the possible applicable defects.

In case of cancellation of the order by the Buyer, the Seller in any case has the right, besides the retention of the advance payments, to a compensation equal to the administrative and production job already carried out.

Exclusions
The following items are excluded from the present supply:
Building works included machinery foundations, underground ducts, utilities passages, support platforms, both in cement and in stainless steel etc.
Factory grounding.
Anti-fire plants.
Ambient air dehumidification plants (antistatic).
Civil works for offices, utilities, etc. including lighting installation, heating, conditioning, drinkable water, sewer, electric energy, insulation, etc.
Electric cabinet of transformation and connections to our power cabinets.
Industrial water ducts.
Air compressor and ducts upstream our distribution panels.
General carpentry structures: operation platforms, safety protections, various materials not being part of the supplied machinery or as required modifications.
Material handling equipment and internal/external transport both for the unloading of the machines from the means for transport and for the assembling operations and for the following handling of the finished products as well as labor.
Accessory machines: raw material pre-treatment plant (drying and/or dehumidification), raw materials mixing and/or dosing system, off-line trims granulation and/or grinding unit, corona treatment unit and/or ennoblement of the finished product, printers, thickness gauges, other accessories.
Mechanic and electric tools: for machinery assembling and maintenance only if they are into the standards.
Materials welding, cutting, drilling tools, work in general.
Oils and lubricating grease, reducer oil and expendable materials in general.
Raw materials for start-up and line testing both carried out preliminarily both at Seller's and Buyer's premises.
Unskilled and skilled labor during the assembling, start-up and testing operations.
Training of Buyer's personnel after the line start-up and testing.
All that is not explicitly indicated in the present offer.







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

# GENERAL CONDITIONS OF SALES

1.    SUBJECT OF THE SALE

The lines, the machines and the devices described in the Seller's order confirmation make the object of the present contract sub. Attachment A.

The equipment, the machinery and the devices described in the Seller's order confirmation make the "Line".

Any other part of the same, even useful for their functioning, is extraneous if not specifically mentioned.

2.    WARRANTY AND LIABILITY

The Seller warrants to the Buyer that the machines manufactured under this contract is exempt from defects that make them inappropriate for using for a period of 12 months from the date of delivery.

The claims, subject to expiration, must be made known in writing to the Seller within 8 days from their detection and must indicate in details the alleged defects and no-compliances.

The warranty consists of the repair or of the substitution free of charge of the spares defective for faults of the material, of the construction or of the manufacture, only and exclusively if such parts, whenever necessary, are returned to the Seller.

The forwarding costs, the transport fees or any other expense or tax ensuing both from the return of the faulty part and from the dispatch of the new spare, will be exclusively charged to the Buyer.

The Parts agree to exclude the possibility to terminate the contract or any other reward for damage in case of defects.

If the repair or the substitutions must be made in the place where the machine is installed, the travel and lodging expenses of the Seller's technicians and operators will be agreed every time.

The Seller will not be held responsible for the defects deriving from materials or projects supplied by the Buyer. The Seller won't be held responsible in case the machine has used incorrectly or differently from what provided by the Instruction manual.

The warranty does not comprise defaults or breaks due to normal wear, negligent maintenance, incapability, neglect or misuse of the machine by the Buyer.

The warranty is also excluded in case the payments are not made on due time by the Buyer at the due expiry or if the machine or part of it has been modified or repaired without the Seller's authorization.

The Parts agree that if the material cannot be delivered for reasons not imputable to the Seller's will and responsibility or is delivered with a delay, the Seller's cannot be held responsible for the missing delivery, the delay or the possible applicable defects.

In case of cancellation of the order by the Buyer, the Seller in any case has the right, besides the retention of the advance payments, to a compensation equal to the administrative and production job already carried out.

3.    RETENTION OF TITLE

The sale is submitted to the retention of title in favour of the Seller. Up to the full and integral payment of the agreed price the property of the goods will be of the Seller. According to the art.1523 c.c., the risks will rest on the Buyer from the moment of delivery.

4.    EXCLUSION OF RESPONSIBILITY

The Seller cannot be held responsible for possible periods of missing production and machine inactivity, nor for any possible defects, even indirect, deriving or anyhow related to them.

 



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES



Any value as to the hourly output of the Line object of the order is to be considered indicative and, in any case, refers to the use of the Line with known and suitable materials as indicated by the Seller.

5.    CONSERVATION AND CUSTODY
Up to the whole and integral payment of the agreed price, rest on the Buyer the risks ensuing from the custody and the conservation of the sold products.

The Buyer undertakes to provide himself beforehand with an insurance to cover such risks and to inform the Seller about its terms.

6.    CHARGES, EXPENSES AND TAXES
All the expenses, charges and taxes/duties deriving from the present contract are exclusively at the Buyer's charge.

7.    APPLICABLE LAW AND COMPETENT COURT
The contract is regulated by the Italian law with the exception of the conflict rules of such legal order, which are not reminded here. In no case will be applied the Convention of the United Nations on the international sale contracts of movables, approved in Wien on 11.4.1980.

In case of controversy as to the interpretation, the validity and/or the execution of the contract, as well as to any other subject related to the contract, such controversy will be settled and resolved exclusively by the Court of Milan, with the exclusion of any other alternatively competent Court.

8.    MODIFICATIONS OF THE BUYER'S COMPANY
The Buyer will have to inform immediately the Seller of all the company's modifications (for example, but not exhaustive, the company's or concern's transfer, amalgamation, breakup or transformation, renting or transfer of part of the enterprise or similar). The Seller will have the faculty to declare the contract terminated or to terminate it or to pursue the relation.

In any case the original Buyer, wherever possible, will be held responsible joint and several with the subject that took the place.

9.    SUNDRIES
The attachments are integral part of the present contract.

The possible invalidity or ineffectiveness of one or more of the Conditions' agreements won't affect the validity and efficacy of the other agreements that shall have to be considered as valid and efficacious.

According to and a for the effects of the art. 1341 and 1342 c.c., the Buyer declares to accept expressly all the clauses.

10.    AUXILIARY SERVICES INCLUDED
Supply of the layout of the complete line: indication of the connection points to the utilities and details of the foundations.
Supply of 2 copies of the manual for the installation, use and maintenance: as per CE rules, in English/Country of installation language.



ATTACHMENT B

PLASTIC TECHNOLOGY SINCE 1950



Since 1950
union
OFFICINE MECCANICHE

# ORDER CONFIRMATION

## N. 21/1047_REV.4



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

www.unionextrusion.it





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

San Vittore Olona, 04.06.2021

Our Reference: Sales Dept. FP/ns
Code: ST-CA

Messers

Mafcote Inc.
108 Main Street
Norwalk, CT 06851

**Order confirmation n. 21/1047_Rev.4**

Attention to: Mr. Steven Schulman
sschulman@mafcote.com
Mr. Fred Schrafft
schrafflie@yahoo.com

## SCOPE OF SUPPLY:

Complete second-hand extrusion line type XPSF-200 for the production of XPS sheet, width 1250 mm, thickness 2 - 5 mm, output 200 kg/h. Line height 4400 mm.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

**UNION officine meccaniche S.p.A.** Socio Unico
Via 1° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331 519300 - Fax +39 0331 518370 - E-mail: info@unionextrusion.it
C.F. e P.IVA 02641110155 - V.A.T. n.02641110155 - R.I. 02641110155
Reg. Imprese n. 228499 - REA MI 1171013 - Cap. Soc. € 2.000.000,00 i.v.

  

www.unionextrusion.it

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## GENERAL TECHNICAL DATA

| ELECTRICAL | Power supply | 3-phases x 400 V + G (the customer should install the transformer) |
| | Frequency | 50 Hz |
| | Max. power surge | ± 10% |
| | Protection | IP54 |
| | | Atex zone D class 2B for blowing agent dosing device only |

| WATER | Temperature | 8°C |
| | Pressure | max. 4 bar |
| | Hardness | max. 8 – 10° dH |
| | Carbonic acid | max. 50 mg/l |
| | Index of pH | 7.7 – 7.8 |

| COMPRESSED AIR | Line pressure | 6/8 bar |
| | Quality | Filtered and dry |

| ENVIRONMENTAL CONDITIONS | Site location | USA |
| | The line is designed for | indoor installation |
| | Minimum indoor temperature | + 5°C |
| | Maximum indoor temperature | + 40°C |
| | Altitude | ≤ 1000 m see level |

| PAINTING | Machine | RAL 7032 (grey) |
| | Protections | RAL 2000 (orange-yellow) |
| | Switch cabinets | RAL 7032 (grey) |

NOTE 1:     All the technical data of the present document are to be considered only indicative and subject to possible revision during the development of the project.

NOTE 2:     The "connecting points" needed to connect all the equipment of the line to the utilities (electrical, chilled water, industrial water, compressed-air, gas) must be available at the site of installation and provided by the buyer.

The "connecting points" are more than one along the line.

  




SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## MAIN DATA

| | |
|---|---|
| Throughput | up to 200 kg/h, depends on sheet thickness and type of the blowing agent used |
| Sheet foam density | min. 40 - 70 kg/cm³, depends on type of the blowing agent used |
| Sheet thickness | 2 - 5 mm (mechanical limits) |
| Coil diameter | max. 2000 mm |
| Sheet width | 1250 mm |
| Mechanical speed | 25 m/min |
| Production speed | 15 m/min |
| Height of screw centreline | 1050 mm |







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## LINE COMPONENTS AND PRICE

ITEM 1   N. 1   FEEDING AND GRAVIMETRIC DOSING DEVICE

ITEM 2   N. 1   CO-ROTATING TWIN SCREW EXTRUDER 127 / 32 D

ITEM 3   N. 1   BLOWING AGENT DOSING DEVICE

ITEM 4   N. 1   STATIC MIXER

ITEM 5   N. 1   EXTRUSION DIE

ITEM 6   N. 1   COOLING RING

ITEM 7   N. 1   COOLING CALIBRATOR APPROX. 398 MM

ITEM 8   N. 1   "S" TAKE-OFF UNIT

ITEM 9   N. 1   TWIN CANTILVER WINDER

ITEM 10  N. 1   ELECTRICAL EQUIPMENT

ITEM 11  N. 1   INSTALLATION AND START-UP
(3 weeks of 5 working days included;
local transport, board & lodge costs excluded)

**TOTAL PRICE CIF LOUISVILLE + CUSTOM DUTY**          €uro   326.000=








SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
Ready in Union.

Terms of delivery
CIF Louisville port + custom duty.

Transport
Included in the price.

Packaging
Included in the price.

Terms of payment
- 25% down payment at the order
- 50% against shipping documents
- 20% at installation completed
- 5% at 30 days from start-up

Bank details for transfer:
BANCO BPM S.P.A.
20028 San Vittore Olona (MI)
Italy
IBAN: IT62O0503034337910000000048710
Bic: BAPPIT22

Warranty
This is a used (second-hand) extrusion line produced by LMP Impianti s.r.l. and covered by warranty only on mechanical
parts not subject to wear for 6 months.

Exclusions
The following items are excluded from the present supply:
Building works included machinery foundations, underground ducts, utilities passages, support platforms, both in cement
and in stainless steel etc.
Factory grounding.
Anti-fire plants.
Ambient air dehumidification plants (antistatic).
Civil works for offices, utilities, etc. including lighting installation, heating, conditioning, drinkable water, sewer, electric
energy, insulation, etc.
Electric cabinet of transformation and connections to our power cabinets.
Industrial water ducts.
Air compressor and ducts upstream our distribution panels.
General carpentry structures: operation platforms, safety protections, various materials not being part of the supplied
machinery or as required modifications.
Material handling equipment and internal/external transport both for the unloading of the machines from the means for
transport and for the assembling operations and for the following handling of the finished products as well as labor.
Accessory machines: raw material pre-treatment plant (drying and/or dehumidification), raw materials mixing and/or
dosing system, off-line trims granulation and/or grinding unit, corona treatment unit and/or ennoblement of the finished
product, printers, thickness gauges, other accessories.
Mechanic and electric tools: for machinery assembling and maintenance only if they are into the standards.
Materials welding, cutting, drilling tools, work in general.
Oils and lubricating grease, reducer oil and expendable materials in general.
Raw materials for start-up and line testing both carried out preliminarily both at Seller's and Buyer's premises.
Unskilled and skilled labor during the assembling, start-up and testing operations.
Training of Buyer's personnel after the line start-up and testing.
All that is not explicitly indicated in the present offer.




EXTRUSION LINES FOR FOAM PRODUCTS

PLASTIC TECHNOLOGY SINCE 1950



Since 1950

# ORDER CONFIRMATION

## N. 21/1137



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

www.unionextrusion.it





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

---

San Vittore Olona, 04.06.2021

Our Reference: Sales Dept. FP/ns
Code: ST-CA

### Order confirmation n. 21/1137

Messers

**Mafcote Inc.**
108 Main Street
Norwalk, CT 06851

Attention to: Mr. Steven Schulman
    sschulman@mafcote.com
    Mr. Fred Schraffi
    schrafflie@yahoo.com

### SCOPE OF SUPPLY:
Set of mandrels for used XPS sheet extrusion line.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

**UNION officine meccaniche S.p.A.** Socio Unico
Via 1° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331.519250 - Fax +39 0331.518370 - E-mail: info@unionextrusion.it
C.F. e P.IVA 07641110155 - V.A.T. n.IT07641110155 - Abb.C. A02/9164
Reg. Imprese n. 239499 - REA MI 1171813 - Cap. Soc. € 2.500.000,00 i.v.

    

w w w . u n i o n e x t r u s i o n . i t

---

    





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## COMPONENTS AND PRICE

ITEM 1   N. 1   MANDREL DIAM. 235,5 MM

ITEM 2   N. 1   MANDREL DIAM. 332,5 MM

ITEM 3   N. 1   MANDREL DIAM. 364,5 MM

**TOTAL PRICE CIF LOUISVILLE + CUSTOM DUTY**          €uro   39.000=





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
8 weeks from order.

Terms of delivery
CIF Louisville port + custom duty.

Transport
Included in the price.

Packaging
Included in the price.

Terms of payment
- 75% upon shipment
- 25% upon installation and commissioning of the machine

Bank details for transfer:
BANCO BPM S.P.A.
20028 San Vittore Olona (MI)
Italy
IBAN: IT62O0503434379100000004871O
Bic: BAPPIT22



ATTACHMENT C

<u>Product Specifications and Production Output</u>

<u>Product Specification</u>

 3.81 Thickness (mm)

0.15 Thickness (inch)

0.019 gms per SQ CM

17.71  gms per SQ FT

40.01 KG per cubic meter

2.50 Pounds per cubic foot

Widths of foam rolls: 29", 41", 45",  49"


<u>Production Output</u>

300 pounds per hour running

968 MSI per hour

PLASTIC TECHNOLOGY SINCE 1950



# ORDER CONFIRMATION

### N. 21/1137



SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

**EXTRUSION LINES FOR FOAM PRODUCTS**

www.unionextrusion.it



EXHIBIT

_D_





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

San Vittore Olona, 04.06.2021

Our Reference: Sales Dept. FP/ns
Code: ST-CA

Order confirmation n. 21/1137

Messers

Mafcote Inc.
108 Main Street
Norwalk, CT 06851

Attention to: Mr. Steven Schulman
sschulman@mafcote.com
Mr. Fred Schrafft
schrafftie@yahoo.com

SCOPE OF SUPPLY:

Set of mandrels for used XPS sheet extrusion line.

All as per the technical description attached.

Mr. Ferdinando Passoni
President

*Ferdinando Passoni*

UNION officine meccaniche S.p.A. Socio Unico
Via I° Maggio 12/14 - 20028 S.Vittore Olona (MI) ITALY
Tel. +39 0331.519350 - Fax +39 0331.518470 - E mail info@unionextrusion.it
C.F. e PIVA 07641110155 - V.A.I. n.07641110155 - Meccn. A009490t
Reg. imprese n. 209499 - REA MI 1121813 - Cap. Soc. € 2.500.000,00 i.v.

  

www.unionextrusion.it

 





SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## COMPONENTS AND PRICE

ITEM 1    N. 1    MANDREL DIAM. 235,5 MM

ITEM 2    N. 1    MANDREL DIAM. 332,5 MM

ITEM 3    N. 1    MANDREL DIAM. 364,5 MM

TOTAL PRICE CIF LOUISVILLE + CUSTOM DUTY          €uro   39.000=







SHEET
BOARD
PROFILE
PIPE
RECYCLING
SPECIAL LINES

## SALES TERMS

Delivery
8 weeks from order.

Terms of delivery
CIF Louisville port + custom duty.

Transport
Included in the price.

Packaging
Included in the price.

Terms of payment
- 75% upon shipment
- 25% upon installation and commissioning of the machine

Bank details for transfer:
BANCO BPM S.P.A.
20028 San Vittore Olona (MI)
Italy
IBAN: IT62O0503433791000000048710
Bic: BAPPIT22

ORDER CONFIRMATION N. 21/1137                    4                    

ATTACHMENT C

Product Specifications and Production Output

Product Specification

 3.81 Thickness (mm)

0.15 Thickness (inch)

0.019 gms per SQ CM

17.71  gms per SQ FT

40.01 KG per cubic meter

2.50 Pounds per cubic foot

Widths of foam rolls: 29", 41", 45",  49"

Production Output

300 pounds per hour running

968 MSI per hour

**BUYER:**
MAFCOTE INC. ("MAFCOTE" or "US")
108 MAIN STREET
NORWALK, CT 06851

 **Mafcote**

PURCHASE ORDER

PO# 1324B

**VENDOR:**
Union Officine Meccanice ("Union" or "You")
Via 1 Maggio 12/14
S. Vittore Olona (Mi) Italy 20028

Contact: Ferdinando Passoni
Email: passoni@unionextrusion.it
Phone: +39-033-151-9300

**SHIP TO:**
Royal Consumer Products
1450 S. 10th Street
Louisville, KY 40210

**Please send all invoices to:**
Steven A. Schulman

| | NET | FREIGHT CHARGES: | none | | CARRIER: | | CONFIRM TO: | |
|---|---|---|---|---|---|---|---|---|
| DATE ORDERED: | 7/18/21 | DATE REQUIRED: | See below | | SHIP VIA: | | | |
| FOB DELIVERED: | F A Delivered to our Louisville Plant | | | | PURCHASING AGENT: | | TAXABLE / NON TAXABLE: | |
| COMMENTS: | | | | | | | | |

### Description of Goods / Services to be Provided

1-The PO is for 50% of the duty due to the US Customs to be paid to Union upon release of the Machine bought under PO 1311B as per the attached email dated 7/16/21 at 11:30am. Estimated cost is $3782.00 USD for our share of the duty.

2-PO 1311B is hereby reinstated with all terms as is, including the reaffirmation of the representation and warrantee regarding conversion of electric input from European to American electricity as expressed in the attached email date 7/16/21 at 4:24 am.

DO NOT SHIP GOODS WITHOUT A WRITTEN ACKNOWLEDGED ORDER WITH PRICES
ORDERS FROM THE ABOVE COMPANY ("BUYER") AND ANY MODIFICATION OF ANY ORDER SHALL HAVE NO FORCE OR EFFECT AND ARE NOT VALID UNLESS AND UNTIL YOU ("SELLER") RECEIVE A WRITTEN PURCHASE ORDER OR MODIFICATION OF THIS FORM SIGNED BELOW BY THE PURCHASING MANAGER AND GENERAL MANAGER OF THE BUYER. FURTHER, IF THIS PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS (CAPITAL ITEMS, LEASES, SERVICE AGREEMENTS, EQUIPMENT ETC.), THIS PURCHASE ORDER AND ANY MODIFICATIONS REQUIRE TWO SIGNATURES, THE SIGNATURE OF THE GENERAL MANAGER OF THE BUYER ENTITY AND ALSO THE SIGNATURE OF AN EXECUTIVE OFFICER OF MAFCOTE. WHEN MAFCOTE IS THE BUYER TWO SIGNATURES ARE STILL REQUIRED FOR A VALID PURCHASE ORDER. IF THE MAFCOTE PURCHASE ORDER COVERS GOODS HAVING A VALUE IN EXCESS OF FIFTY THOUSAND ($50,000.00) DOLLARS OR INVOLVES GOODS NOT BOUGHT IN THE ORDINARY COURSE OF BUSINESS OR EQUIPMENT, THE PURCHASE ORDER AND ANY MODIFICATIONS REQUIRES THE SIGNATURE OF TWO EXECUTIVE OFFICERS, NO ONE ELSE IS AUTHORIZED TO SIGN THIS ORDER OR MODIFICATION.
*INVOICE IN NAME OF AND TO ADDRESS OF ORIGIN, IN DUPLICATE, WITH SHIPPING DOCUMENTS.
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS OF PURCHASE ON THE REVERSE SIDE. NONE OF THESE TERMS OR CONDITIONS SHALL BE DEEMED WAIVED, MODIFIED OR ELIMINATED EXCEPT THROUGH A WRITTEN INSTRUMENT SIGNED BY BUYERS' AUTHORIZED AGENTS. PLEASE READ THE TERMS AND CONDITION OF SALE CAREFULLY.

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

**EXHIBIT**

E

REVERSE SIDE OF PURCHASE FORDER TERMS AND CONDITIONS

Page 1 of 1

1.  ACCEPTANCE. The order is accepted by Seller delivering Seller's written acceptance to Buyer within ten (10) days of the order's date. Any proposal for additional or different terms or any attempt by Seller to vary, in any degree, any of the terms of this purchase order is Seller's acceptance shall not operate as a rejection of this purchase order unless the variances is in the terms of the description, quantity, price or delivery schedule of the goods, but shall be deemed a material alteration hereof, and this purchase order shall be deemed accepted by Seller without the material alteration. If this purchase order shall be deemed an acceptance of a prior offer by Seller, this acceptance is limited to the express terms contained on the face and reverse side hereof. This order, with any Buyer attachments, constitutes the complete agreement of the parties. No waiver or other modification, deletions or additions to the terms of this order shall be valid or enforceable unless in writing and signed by authorized representatives of both parties. No requests or attempts to modify any of the terms of this purchase order shall be binding on Buyer unless made in writing and signed by Buyer's authorized representative.

2.  PRICE. Buyer shall not be billed at prices higher than those stated on the front of this order. Unless otherwise specified, the price stated includes all charges for packing, marking, storage and transportation to point of delivery (F.O.B. destination). Seller will separately stated in Seller's invoice and paid by Buyer unless an exemption is available, Seller agrees that any price reduction, rebate or discount made with respect to the type of goods covered by this order after its placement but before receipt of the goods or the invoice, whichever is later, will be applicable to this order.

3.  SHIPPING AND PACKING. Substitutions will not be accepted. Seller shall be responsible for safe and secure packing and shall separately mark and number all cases, packages, etc. showing the corresponding numbers on the invoice; and, unitemized order must be shipped complete by the date requested but must not be shipped more than one week in advance of the time or times specified herein without Buyer's prior written approval. When more than one shipment is made against any order, Seller is "Final Shipping" on shipping papers and invoice accompanying the last shipment in the order. Seller shall not ship excess quantities without Buyer's prior written approval. Except as otherwise provided herein, Buyer shall not be obligated to accept untimely, excess or under shipments and such shipments, in whole or in part may, at Buyer's option, be returned to Seller or held for disposition at Seller's expense and risk. Seller shall invoice all shipments to this state. The invoice shall describe the items, state the purchase order number and be attached to the original packing slip or other shipping receipt. For faster straight services, the carrier's delivery receipt shall be accepted by Buyer.

4.  DELIVERY AND DELAYS. The shipping date is specified as item on the face (front) of this order. Time is of the essence to deliveries under this order. Buyer reserves the right to cancel the order and reject the goods upon default in time, rate or manner of delivery. Buyer also reserves the right to refuse or suspend deliveries in the event of contingencies beyond Buyer's control, including, by example, labor disputes, acts of God, extreme weather, government restrictions, changes in laws and regulations, commercial impracticability, acts of terrorism, embargoes or declared state of war.

5.  INVOICES. Within 24 hours after shipment, one copy of the packing slip, bill of lading and other shipping documents, together with an invoice bearing the Buyer's purchase order number must be mailed to the Buyer to the office specified herein.

6.  INSPECTION, ACCEPTANCE AND REJECTION. All goods ordered hereunder will be subject to inspection and testing by Buyer, and to the extent practicable and at all times and places, including the period of manufacturing, and in all circumstances, additional cost to Buyer. Such goods will also be subject to final inspection and acceptance by Buyer after delivery to Buyer. Inspections and/or payments by Buyer before delivery will not constitute final acceptance. If the goods delivered do not meet the specifications or otherwise do not conform to the requirements of this order, Buyer shall have the right to reject such goods. Goods which have been delivered and rejected in whole or in part may, at Buyer's option, be returned to Seller or held for disposition at Seller's risk and expense. Notwithstanding (i) any inspection (ii) any testing (iii) the delivery of goods to the F.O.B. destination; or (iv) any partial payment, all shipments are subject to final inspection and acceptance at Buyer's facility or plant before acceptance is effective. No inspection or test made before the final inspection or acceptance shall relieve Seller of any responsibility for defects or for any other failure to meet the specifications or requirements of this order. Seller shall provide and maintain a quality control system, acceptable to Buyer, covering the goods to be furnished hereunder. Where specifications are omitted from this order and absent specific instructions from the Buyer, Seller shall supply goods of similar specifications to those previously supplied to Buyer for the same purpose. Seller warrants that the goods so supplied shall be of the same quality and workmanship as those previously supplied and shall be free from defects in design, material and workmanship. Where such goods have not been previously supplied to Buyer and the Seller receives instructions from Buyer in writing, Seller warrants that the goods will conform to Buyer's instructions in all respects. These representations and warranties are jointly and severally enforceable by Buyer and by all persons to whom the goods may be sold, resold or transferred by Buyer and are in addition to any and all warranties, both expressed and implied, under the Uniform Commercial Code as adopted by Connecticut. Buyer may charge back and withhold the amount paid for nonconforming or defective goods pending Seller's compliance with warranty obligations hereunder.

    (b)  If requested by Buyer, Seller shall maintain comprehensive liability, product liability and related insurance to protect Buyer for any injury, damages and claims in connection with unsafe or harmful goods.

    (c)  Seller shall indemnify, defend and hold Buyer harmless from and against any harm, all claims, litigation, loss and damages, whatever direct, indirect, consequential and exemplary or otherwise relating to or resulting from any action or inaction by Seller in relation to this order, Seller's failure to comply with all applicable laws, the infringement of any patent, trademark or copyright as the result of any sale, resale or use of the goods delivered hereunder, all claims relating to California Proposition 65 (Cal. Health & Safety Code § 25249.5 et seq.), the nonconformance of the delivered goods to Buyer's approved specifications, and any dangerous, defectious or defective goods delivered hereunder. This indemnification shall extend to all losses, damages, if any, court costs, penalties, fees and disbursements and reasonable attorneys and expert witness fees incurred by Buyer in pursuing or defending any claim, proceeding or litigation. Buyer shall be entitled to pre-judgment interest on all claims associated herewith in the amount of ten percent (10%) per annum.

7.  CONFIDENTIAL RELATIONSHIP. Seller agrees to treat all information, prototypes, samples, drawings and designs ("information") furnished by the Buyer in connection with this order, whether secret, proprietary and confidential, and, absent prior written consent of Buyer's duly authorized officer, agrees to prevent the use or reproduction, by or disclosure or other dissemination of the information to, any person, firm or corporation. Seller shall not grant access or disclose any information to Seller's employees, agents or consultants, other than to those employees on Seller's permanent employ to whom such disclosure is necessary for the effective performance hereunder and for production of the goods and only if such employees are bound by written agreement to maintain confidentiality of all information disclosed to them. Seller shall not in any manner advertise, photograph, publish, announce or release for publication any photograph or statement mentioning Buyer or that Seller has furnished or contracted to furnish the goods required by this order.

8.  WARRANTY, INSURANCE, AND INDEMNIFICATION. (a) Seller warrants to Buyer that the goods will, at the time of shipment conform to the requirements of this order, to the approved specifications and to the description on the face (front) of this order, that Seller shall convey good title to the goods, that such goods will be delivered free from any security interest or other any lien or encumbrance, and that such goods will be free from defects in material and workmanship. In addition, goods shall carry a warranty consistent with any warranty included in the specifications, provided to Seller by Buyer. Seller represents and expressly warrants that all goods ordered according to specifications or sample furnished or approved by Buyer. (b) Seller shall conform thereto in all respects and in all respects will be suitable for the purpose intended and will be merchantable and of first quality and workmanship and free from defects in design, material and workmanship. Where specifications are omitted in the purchase order and in the absence of specific instruction from Buyer, Seller shall supply goods of similar specifications as those previously supplied to Buyer for the same purpose. Seller warrants that the goods so supplied shall be of the same quality and workmanship as those previously supplied and shall be free from defects in design, material and workmanship. Where such goods have not been previously supplied to Buyer and the Seller receives instructions from Buyer in writing, Seller warrants that the goods will conform to Buyer's instructions in all respects. These representations and warranties are jointly and severally enforceable by Buyer and by all persons to whom the goods may be sold, resold or transferred by Buyer and are in addition to any and all warranties, both expressed and implied, under the Uniform Commercial Code as adopted by Connecticut.

9.  TITLE AND RISK OF LOSS. Title to all goods to be delivered hereunder shall remain in the Seller until such goods are delivered to Buyer at the destination location specified on the front side of this order and until Buyer conducts a final inspection of the goods and accepts the goods. All risk of loss or of damages to goods delivered by Seller hereunder shall be on Seller until title to such goods passes to Buyer at destination, and Seller shall bear all risk of loss and damage to goods rejected by Buyer after notice of rejection and until such goods are redelivered to Buyer. If materials furnished by Buyer for performance of this order, all risks of loss and damage to such material shall remain on Seller until the material has been delivered to the Buyer.

10. CHANGES. Buyer may, at any time before shipment for stock goods or before the manufacture of order for specialty made goods, in its sole discretion, by written instruction to Seller, signed by a duly authorized agent: (a) Change the shipping and packing instruction; (b) Increase or decrease the quantity of goods ordered; (c) Change the drawings, design or specifications; and/or (d) Change the delivery schedule. Seller shall proceed promptly to make such increases/decreases or changes in accordance with the terms of the written instruction. If the instructions cause an increase or decrease in the price of the goods under this order, Seller shall promptly notify Buyer of such changes in price, and Buyer shall, in its sole discretion, have the right to accept or reject such goods. Except as may be directed or agreed to in writing by Buyer's duly authorized agent, Seller shall not make any changes in the shipping or packing instructions, quantity of goods ordered, delivery schedules, or any other aspect of performance under this order. Seller must timely notify Buyer's duly authorized agent within ten (10) days after the receipt of the instructions of any conditions or changes which are unacceptable to the Seller. Upon such notification by the Seller, Buyer's duly authorized agent may either alter the instructions to change the order to agree mutually upon conditions or terminate the order without cost or liability to Buyer.

11. INTELLECTUAL PROPERTY. Seller represents that the goods furnished hereunder do not infringe upon or otherwise violate any patent, trademark or copyright held by a third party.

12. DESIGNS. Buyer shall retain title to any designs, sketches or drawings furnished by or paid for by Buyer in connection with this order. All designs shall be recorded and identified as the Buyer's property, maintained in good condition, insured for benefit of Buyer, and be safeguarded by Seller at the Seller's risk and be replaced by Seller if lost, damaged or destroyed. The designs, sketches or drawings shall be used exclusively in the production of the goods required by this order, and shall not be used for production of larger quantities than those specified herein, or in the production, manufacture or design of any goods or products for any other person without Buyer's written consent.

13. TAXES. Except as otherwise provided herein and unless prohibited by statute, Seller agrees to pay any federal, state or local tax of any kind or nature which may be imposed upon the goods ordered hereunder, or by reason of their sale or delivery.

14. TERMINATION. (a) For default. Buyer may terminate this order, or any part hereof, without liability, by written or electronic notice of default to Seller under any of the following conditions: (i) Seller neglects, refuses or fails to produce the goods and make deliveries within the time specified or extensions agreed to in writing by Buyer's duly authorized agent; (ii) if Seller fails to comply timely with any other provisions of this order or fails to make timely progress toward completion and fulfillment of this order, and does not cure any such failure within a period of ten (10) days (or such longer period as Buyer may schedule) after written notice from Buyer specifying such failure; or (iii) if Seller becomes insolvent, is subject to proceedings under any law relating to bankruptcy, insolvency or the relief of debtors, or otherwise fails to provide a satisfactory written assurance of performance if demanded by the Buyer. In the event of such termination, Buyer may purchase similar goods elsewhere and otherwise cover and secure replacement of the goods, and Seller shall be liable to the Buyer for any additional expenses and increased costs to procure such goods. Seller shall continue timely performance of this order to the extent not terminated.

    (b)  For convenience. Buyer reserves the right in its sole discretion to, and may at any time, terminate this order, or any part hereof, by written, or electronic notice for its convenience. In the event of such termination, Buyer will pay Seller's direct costs incurred to the date of notice and termination, which must be verified and determined in accordance with generally accepted accounting principles. Seller shall not be entitled to any other damages whatsoever, including consequential or punitive damages. Goods produced or partially produced (work in progress and materials) hereunder, upon such payment, shall become Buyer's property.

15. AUDIT. Seller shall keep adequate accurate and complete records of chargeable hours of direct labor and of costs of materials used in the performance of this order, which shall be subject to audit by Buyer in the event of termination, dispute, or in any other order for which the place is based on time and cost of material.

16. ASSIGNMENT. Seller shall not assign this order and shall not contract, subcontract or delegate any duty or obligation under order without Buyer's advance written approval.

17. VENUE AND GOVERNING LAW. This agreement shall be governed, construed and enforced in accordance with the laws of the state or origin of this purchase order. The parties agree that the courts of the state of the origin of this purchase order and the federal courts located therein, shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. The Uniform Law on the Formation of Contracts for the Sale of Goods based on the United Nations Convention on Contracts for the International Sale of Goods shall not be applicable and all the terms of this purchase order must be construed in accordance with the Uniform Commercial Code as enacted in the state of origin of this purchase order.

18. Conformance with applicable laws. Seller warrants and represents that the manufacture of the goods and their performance of all manufacturing and related services hereunder to produce the goods have been accomplished in strict conformity with all applicable federal, state and local laws governing such manufacture and performance, including all consumer product safety laws (including but not limited to Consumer Product Safety Act, the Consumer Product Safety Improvement Act, California Topics in Packaging Prevention Act, California Proposition 65), and laws relevant to the working conditions and wages of the personnel engaged in such manufacture and production. Seller warrants and represents that the goods sold hereunder are free of all chemicals known to the State of California to cause cancer or reproductive toxicity, or that the quantity of the chemical(s) in question is in compliance with applicable state and federal laws, including California Proposition 65.

19. INTERPRETATION. The parties intend that the provisions of this purchase order shall not be construed in favor of or against either party by reason of the extent to which a party or its professional advisors participate in the preparation and drafting of the purchase order. This purchase order comprises the complete and final agreement between Seller and Buyer and supersedes all prior negotiations, proposals, representations, commitments, understandings or agreements between the Buyer and Seller, either written or oral, or the subject of other agreements, quotations or acknowledgements.

20. PAYMENT AMOUNT. Anything to the contrary notwithstanding, in the event of a bona fide dispute and Buyer pays what Buyer considers to be the proper amount (or amount less on bona fide offset) and a counterclaim determines that further amounts are due Seller, such payments shall be without interest, penalty or other fees of any kind whatsoever.

21. DISCOUNTS. Price discounts will be based on the date of invoice or on the date of products or services are received by the Buyer, whichever is later. No late charges will be assessed to Seller has provided Buyer's Chief Executive Officer advance notice.

**Julie Robinson**

| | |
|---|---|
| **From:** | Sales Service NS - Union Spa <sales.service.ns@unionextrusion.it> |
| **Sent:** | Tuesday, July 20, 2021 6:13 AM |
| **To:** | Steven Schulman |
| **Cc:** | Greg Smith; kp1rn@sbcglobal.net; Dell Eisenbarth; schrafftie@yahoo.com; Lynne Naring; Irene Pshyk; Ferdinando Passoni |
| **Subject:** | I: Union PO 1324B & PO 1311B |

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dear Mr. Schulman,

Ok, thank you, you can proceed with the down payment.
Please, note that the dosing system is suitable for working with propane, butane and pentane, but not with $CO_2$.

Thank you.

*Cordiali saluti/Best regards*

*Anastasia*
*Uff. Vendite/Sales Dept.*

Union Officine Meccaniche s.p.a. – Socio Unico
Via I Maggio 12/14
20028 San Vittore Olona (MI)
Tel. +39 0331 519300
Fax. +39 0331 518370
Web: www.unionextrusion.it

**Da:** Steven Schulman <sschulman@mafcote.com>
**Inviato:** lunedì 19 luglio 2021 19:12
**A:** Ferdinando Passoni <passoni@unionextrusion.it>
**Cc:** Greg Smith <gsmith@mafcote.com>; Greg Smith <kp1rn@sbcglobal.net>; Dell Eisenbarth <dell@mafcote.com>; fred schrafft <schrafftie@yahoo.com>; Steven Schulman <sschulman@mafcote.com>; Lynne Naring <lnaring@mafcote.com>; Steven Schulman <sschulman@mafcote.com>; Irene Pshyk <ipshyk@mafcote.com>`
**Oggetto:** FW: Union PO 1324B & PO 1311B

Hi Ferdinando,

I am returning to work this Wednesday and among the first things I plan is to sign and send PO 1324B to you and to wire transfer the 81,500 euro in the am 7/21/21. Please make arrangements based upon such plans.

Please make sure that you completely agree with the attached.

Thanks for your cooperating and look forward to working together on this project.

1



EXHIBIT
F

Thanks,

*Steve*

Steven Schulman
Mafcote Inc.
203-644-1212

---

CONFIDENTIALITY NOTICE: This email, along with any attached documents, contains information from Mafcote, Inc. which is confidential and/or legally privileged. The information and documents are intended only for the individual to whom it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, printing, forwarding, or the taking of any action in reliance on the contents of this email is strictly prohibited; and this email and any printouts should be destroyed immediately. If you have received this email in error, please notify us immediately by reply email.